# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 48525-7-II |
| Respondent, | |
| v. | |
| SHELLY MARGARET ARNDT, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — Shelly Arndt appeals her convictions for aggravated first degree murder, with aggravating circumstances and special allegations of first degree arson, domestic violence, and a particularly vulnerable victim; first degree felony murder predicated on first degree arson, with aggravating circumstances and special allegations of domestic violence and a particularly vulnerable victim; first degree arson, with aggravating circumstances and special allegations of domestic violence and an impact on persons other than the victim; and six counts of second degree assault.

We hold that the trial court did not err when it excluded (1) Dale Mann's testimony about the melted bucket, the plastic container, demonstrative evidence, the polystyrene test results, flashover, and smoke visibility; and (2) Craig Hanson's testimony. However, we hold that the trial court erred when it excluded Mann's testimony about his review of police reports, but the error was harmless. We further hold that the trial court did not violate Arndt's right to be free from double jeopardy by entering convictions for aggravated first degree murder with a first degree arson aggravating circumstance and first degree arson. But the trial court violated Arndt's right to

be free from double jeopardy by entering convictions for aggravated first degree murder with a first degree arson aggravating circumstance and first degree felony murder because the legislature intended for the conduct underlying Arndt's murder convictions to be punished as a single offense. Accordingly, we remand this case back to the trial court to vacate Arndt's first degree felony murder conviction, but we affirm the remaining convictions.

FACTS

A.    THE INCIDENT

Sean and Kelly O'Neil[1] lived in a two-story split-level home with three of their children. The home was heated by a wood stove, primarily fueled by burning presto logs and wood kindling, located in the living room upstairs. There also was a gas insert and baseboard heaters to heat the downstairs, but both were turned off. There was a vent between the upstairs and downstairs directly underneath the hearth of the wood stove.

Downstairs, there were some cardboard boxes, a trunk, a foosball table, a weight rack and bench, a bookcase with books, a coffee can, the gas insert and hearth, a television, the baseboard heaters, a floor fan, and a leather couch. There also were three beanbag chairs that were by the foosball table.

On February 23, 2014, Arndt and her boyfriend, Darcy Veeder Jr., spent the night at the O'Neils' house. The two were drinking with Kelly and a friend, Donny Thomas. Arndt, Veeder, and Thomas were the last to go to bed. A fire was lit in the wood stove, but it was going out, and Thomas and Veeder could not get it going again. Later that night, the house caught on fire. Arndt

_____

[1] Because the O'Neils share the same last name, we use their first names for clarity with no disrespect intended.

2

woke Kelly and Thomas, who got out with the kids, but Veeder did not make it out and died in the fire.

B.     THE CHARGES

After an investigation, the State charged Arndt by amended information with aggravated first degree murder, with aggravating circumstances and special allegations of first degree arson, domestic violence, and a particularly vulnerable victim; first degree felony murder predicated on first degree arson, with aggravating circumstances and special allegations of domestic violence and a particularly vulnerable victim; first degree arson, with aggravating circumstances and special allegations of domestic violence and an impact on persons other than the victim; and six counts of second degree assault.

C.     PRETRIAL

The State filed a motion to exclude the testimony of Craig Hanson. The parties agreed that Hanson had worked for the Kitsap County Fire Marshal's Office sometime in 2013 under David Lynam, the fire marshal, but that Hanson was not working there at the time of the fire. Arndt represented that Hanson would testify about what Lynam instructed him to document during the course of a fire investigation and how to gather evidence. Arndt agreed that Hanson did not have facts specific to this case. The State argued that Hanson's testimony should be excluded based on relevancy, hearsay, foundation, and prejudice.

The trial court ruled that Hanson's testimony was not relevant because he was not a part of the investigation in this case nor was he a part of the fire marshal's office at the time of the fire. The trial court also found that Hanson had not been identified as an expert who could testify about

the proper procedures the fire marshal's office is required to follow in an origin and cause investigation.

D.      TRIAL

        1.      Kelly O'Neil and Donny Thomas

Kelly O'Neil testified that in the middle of the night, Arndt woke her up and told her that the house was full of smoke. Kelly realized that the house was on fire. It smelled like burning rubber tires. Once Kelly and Arndt got out of the house, they realized that others were still in the house. They both went back into the house. While going downstairs, Kelly saw an orange glow towards the downstairs family room side.

Donny Thomas testified that Arndt woke him up and told him that there was possibly a fire. Thomas looked to the fireplace, saw nothing, and then went to look downstairs and saw fire coming from the downstairs living room.

        2.      Edward Iskra

Edward Iskra, a fire investigator hired by an insurance company to investigate the fire, conducted an origin and cause investigation of the fire. His purpose in this case was to conduct a fire investigation, not to produce a report. He was able to enter the house after Lynam, the fire marshal, released the scene.

Iskra testified that National Fire Protection Association (NFPA) 921 is a guide for fire investigations and it is appropriate to follow the NFPA 921 in origin and cause investigations.[2]

---

[2] The NFPA requires that the scientific method be followed throughout a fire investigation. Iskra could not think of any other text that was more authoritative than NFPA 921. And the International Association of Arson Investigators states that NFPA 921 is widely recognized as an authoritative guide for the fire investigation profession.

Within that guide is the scientific method, which is a procedure to standardize fire investigations and determine where a fire started.[3] Fire investigators who arrive on the scene later frequently rely on the information gathered by other investigators who arrived first.

After investigating the upstairs area and analyzing the burn patterns, Iskra determined that the fire originated from the recreation room downstairs.[4] Once downstairs, Iskra investigated and ruled out the light switch, outlets, pedestal fan, ceiling fan, television, baseboard heaters, and gas stove as possible origin points. He ultimately concluded that the fire was intentionally set, the exact origin of the fire was on the north side of the stairway in the northeast portion of the couch on the floor, and the ignition source was more likely than not an open flame.

Iskra also concluded that it was possible the room "flashed over,"[5] but that the room did not flash over because of the open stairwell. 9 VRP at 1652. Whether flashover occurred or not did not affect his conclusions because flashover would just tell him where his general area of origin and cause was, and he would still be able to analyze fire patterns to find the point of origin.

---

[3] The scientific method involves (1) recognizing the need or assignment, (2) defining the problem, (3) collecting data, (4) analyzing the data and testing probable hypotheses, and (5) determining the final theory and where the fire started.

[4] The family room and recreation room downstairs were essentially one room divided by a beam, but no wall separated the rooms.

[5] "Flashover" is a process that occurs when a fire is burning within a room and the layer of heat that travels upward has nowhere to go and comes down to preheat the rest of the room and auto-ignite all fuels and contents.

    3.    Kenneth Rice

Kenneth Rice, a senior fire investigator consultant, was asked to perform a technical review[6] of Lynam's origin and cause determination, which is allowed under NFPA 921.[7] Rice was also retained to determine origin of the fire. He reviewed the reports generated by the fire marshal's office, including Lynam's report and the supplemental reports of his deputies, Dale Mann's report, the fire department report, the crime lab report, the coroner's report, and photographs. Rice also spoke with Lynam after conducting his technical review. From the photographs of the downstairs, Rice could tell that the fire did not start in the area by the sliding glass door, nor in the area by the fireplace and right of the fireplace.

After reading Lynam's report and talking to him, Rice still had some concerns about whether an ember could have escaped the fireplace upstairs and traveled through the vent to start a fire downstairs. Rice and Lynam performed a test together to address Rice's concern. The two recreated the hearth and vent assembly, burned two presto logs in the hearth, shoveled a large amount of embers out, and dropped them directly through the vent, onto a basket of newspaper and tissue paper. Out of the handful of embers that came down through the vent, only two burned small holes in the newspaper but did not start a fire. Because the embers did not carry enough energy by the time they reached the paper, a fire was unable to start. Based on the test, Rice testified that "it didn't appear probable that an ember could have escaped the fireplace that was in

---

[6] A "technical review" involves a review of "all the data that [are in] any written reports that are generated, photographs that were taken, [and] evidence that was collected." 10 Verbatim Report of Proceedings (VRP) at 1894.

[7] Rice testified that NFPA 921 is the "most commonly used guide in the community." 13 VRP at 2431.

the upstairs of the home" and start a fire downstairs. 13 Verbatim Report of Proceedings (VRP) at 2379.

Rice and Lynam also conducted a smoke test to see when someone in the upstairs living room would be able to see smoke if the fire was right under the vent. Based on the test, Rice concluded that the fire "on a more probable than not basis did not occur directly under that vent or in [that] area" because the witness statements said that there was not any smoke upstairs when they were notified about the odor of smoke. 13 VRP at 2384.

Rice and Lynam also conducted a furniture ignition test. They lit a beanbag chair on fire with a barbeque lighter next to a leather couch. Once on fire, the beanbag filling started to spill out, pool, and ignite. The pooling spread under the couch and the couch then started to catch on fire.

Rice concluded that the area of origin was the left side of the couch and that the fire was incendiary because of the lack of an accidental ignition source in the area. He also concluded that Lynam's investigation was thorough and followed the scientific method.

4.    David Lynam

David Lynam, the Kitsap County Fire Marshal, investigated the fire. Lynam confirmed that NFPA 921 is the guide he uses for fire investigations. When investigating the origin and cause of a fire, he utilizes the systemic approach in NFPA 921, the scientific method. In doing so, to test a hypothesis, the proper method is to test the negative. NFPA 921 also requires the cause of the fire to be probable, not just possible.

In investigating the origin and cause of the fire using the scientific method, Lynam first examined the upstairs and decided that the fire did not come from the upstairs. Lynam then examined the downstairs.

Downstairs, Lynam saw heavy fire damage to the southwest wall of the family room, which separated the family room and stairwell behind the couch. Lynam later established that the couch area was the area of origin.[8] Lynam then layered[9] around the couch area. After eliminating a number of hypotheses, Lynam determined that the northeast corner of the couch was the point of origin for the fire.

After establishing the point of origin, Lynam began examining for possible causes, which involved gathering information of possible ignition sources and then analyzing them to prove or disprove different hypotheses. This process continued until a hypotheses for the cause of the fire was reached that could not be denied.

One hypothesis was that the outlets started the fire. Lynam had two of the outlets examined by a forensic electrical engineer who found nothing wrong with them, so Lynam ruled them out as the cause of the fire. Lynam then tested a pedestal fan, which was determined to be not plugged in, and ruled the fan out as the cause of the fire. Lynam also tested the baseboard heaters as a cause, but the heaters were off and the breakers for them were also off. Lynam also ruled out the

---

[8] The "area of origin" is the general area where the fire initiated and is less specific than the "point of origin." 8 VRP at 1504-05.

[9] "Layering" is the process of "digging through the debris of a fire," going from the least to the worst damaged areas to determine a point of origin. 8 VRP at 1487. It is the first step in testing a hypothesis and analyzing the scene.

television, fireplace insert, a coffee can, speakers, ceiling fan, bookshelf area, foosball table, and smoking as causes of the fire.

Lynam then considered the hypothesis that an ember from the fireplace upstairs came downstairs and caught the couch on fire. Lynam later conducted a test of that hypothesis and ruled it out. Lynam testified that embers could come downstairs through the vent and ignite something, but only if the embers were scraped off the hearth and put into the vent. And even then, the embers that made it down the vent were incapable of igniting newspaper.

Lynam also hypothesized whether a beanbag chair lit on fire next to the couch could catch the couch on fire. He tested the hypothesis by using a beanbag chair like the one that had been in the house, placed it next to a leather couch, and lit the beanbag chair on fire. The beanbag chair created a pool of fire, which went under the couch and caught the couch on fire. After the couch was done burning, Lynam saw the same burn pattern on the couch that he saw in the O'Neil home, and he smelled the same burning tire aroma that Kelly had reported.

Ultimately, Lynam concluded that the "fire was ignited by application of a handheld flame to combustibles placed on or near the northeast corner of the couch," and it was an incendiary fire. 15 VRP at 2851. Lynam admitted that he did not review the entire sheriff's office case file before generating his report, but that there was nothing in the sheriff's case file that made him want to change his conclusions after he did a complete review of the case file.

5.    Dale Mann

Arndt called Dale Mann as a witness. Mann is a senior forensic chemist who has several fire and arson investigation certifications and is experienced with reviewing materials from a particular incident.

9

Mann testified that he was hired only to review Lynam's origin and cause investigation. Like the other witnesses, Mann also testified that NFPA 921 is the accepted standard for fire investigations. NFPA 921 requires the use of the scientific method and requires scientific evaluation of the evidence and processes. Mann stated that he did not perform an origin and cause investigation or a technical review using the scientific method required by NFPA 921 or conduct a scientific evaluation of the evidence or Lynam's processes. Instead, his review combined aspects of a technical review and a peer review.[10] Mann admitted that most fire investigators do not conduct the type of review that he did in this case. Instead, the most common method used by people when they do the type of review he did "is outlined in [NFPA] 921." 21 VRP at 4059.

The State moved to exclude Mann's testimony on the basis that Mann did not follow the methodology set forth in NFPA 921, which is the standard that should be employed and is the most common method used. The State argued that Mann should not be allowed to opine about the appropriateness of Lynam's investigation when Mann's review did not follow the proper methodology, and because Mann did not follow the proper methodology, his opinions were not trustworthy. The trial court allowed Arndt to voir dire Mann outside the presence of the jury prior to ruling on the State's motion to exclude.

During voir dire, Mann testified NFPA 921 removes the subjectivity of information used by fire investigators and relies on data that has been validated. A witness statement is not data that should be a considered in an investigation until it is validated, verified, or its accuracy is

_____

[10] "Peer reviews" are done on "white papers or articles that are going to be published in a professional journal" and are done by people who have no association with the author of the reviewed material. 13 VRP at 2472-73; 19 VRP at 3732.

authenticated. Typically, data is used to test a hypothesis, and it is contrary to the scientific method to test a hypothesis using speculative or unverified information. He does not consider things that are not data in rendering his opinions.

After a cursory review of Lynam's investigation, Mann concluded that Lynam's file did not include "a tremendous amount of data" and that there was not enough data to ascertain origin and/or cause of the fire. 19 VRP at 3618-19. Despite this conclusion, Mann did agree that Lynam was correct that the origin of the fire was in the downstairs family room.

Although Mann could render his opinion based only on Lynam's investigation file, for the purposes of litigation, Mann went out to the fire scene to collect more data to "further examine the hypothesis" Lynam presented as the origin and cause of the fire. 19 VRP at 3620. Lynam did not validate the witness statement that a beanbag chair was on the foosball table, but Mann relied on that unverified witness statement to challenge Lynam's investigation into the origin and cause of the fire. And in challenging Lynam's investigation into the origin and cause of the fire, Mann did not conduct tests to rule out other possible origins or causes of the fire, like the ceiling fan or the pedestal fan, which is required under NFPA 921.

After voir dire, the State argued that Mann did more than a review of Lynam's fire investigation file. Instead, Mann actually conducted selective testing to reach an origin and cause conclusion solely for the purposes of litigation without following the scientific method required by NFPA 921.

The trial court agreed with the State that Mann "is taking nibbles at doing an origin and cause" investigation, picking and choosing what aspects of the fire scene he wanted to investigate

in furtherance of litigation without following the scientific method required under NFPA 921. 19

VRP at 3650. The trial court stated:

> It is not a problem that he goes to the scene, … but it is a problem when he starts to test … because at that point in time he becomes an investigator. And an investigator, if he is to be considered reliable … if he's going to do an origin and cause, that's fine, let's call it that. But he hasn't done that. He said many times over he didn't do an origin and cause.

19 VRP at 3650-51. The trial court ruled that although Mann agreed with Lynam's opinion about

the origin of the fire, Mann could not give an opinion on the ultimate origin and cause of the fire.

However, Mann was allowed to testify as to his opinions about the procedures Lynam used in

reaching his conclusions about the origin and cause of the fire. Thus, Mann could not testify as to

his own opinion of the origin and cause of the fire and he could not testify as to any testing he

conducted to reach such an opinion.

### a. Melted bucket

On direct examination, Arndt sought to introduce testimony from Mann that he found the

remnants of a melted plastic bucket near where Lynam believed was the point of origin for the fire.

Mann investigated that area of the floor to gather data to test Lynam's hypothesis. The bucket was

adhered to the floor and Mann detached it from the floor with a shovel. Mann was prepared to

testify that he lifted the bucket and found a protected area underneath, which meant that the fire

could not have started there. Arndt sought to introduce this testimony to disprove Lynam's

conclusion that the origin of the fire was near the couch and that the cause was a beanbag that had

been set on fire.

The trial court excluded Mann's testimony about lifting the bucket and his findings

following that lifting, reasoning that lifting the bucket constituted testing. However, the trial court

did allow Mann to testify that he observed the remnants of a melted plastic bucket by the east end of the couch and that the remnants protected the floor; that such buckets were made of polyethylene and that polystyrene is the material in beanbag chairs; that polystyrene survives fire better than polyethylene; and that if the bucket survived, he would have expected the polystyrene pool of liquid from the beanbag chair to survive as well.

        b.      Plastic container

Mann testified that he found remnants of a plastic container by the hearth downstairs and other debris. The plastic was stuck to the floor and did not move if you nudged it. Arndt then asked Mann about protected areas and Mann said,

> I have seen tens of thousands of protected areas in my career. As soon as you have a piece of plastic that's been melted or stuck to a surface, the surface under that material, if the bottom side of that plastic is in pristine condition, that says that the surface it was attached to never went above the melting point of the material that is adhered to it.

20 VRP at 3960. No further questions were asked regarding the plastic container.

        c.      Demonstrative evidence

Arndt sought to question Mann about a demonstration that he performed in his lab and pictures from that demonstration. Arndt insisted that it was not a test but a demonstrative exhibit that showed the principle of open flame combustion. The trial court initially stated that it did not see it as relevant, but allowed Arndt to put on an offer of proof.

The first part of Mann's demonstration involved a carpet with a pool of ignitable liquid that was lit on fire, leaving a protected area. The second part of Mann's demonstration involved a bag of plastic packing peanuts that was lit on fire. When questioned by the State, Mann admitted,

> [W]hen push comes to shove, my conclusion of the interpretation of spalling[11] by Fire Marshal Lynam and the fact that it was caused by a [beanbag] chair placed there contradicts the scientific principles involved in combustion of a plastic like that.

20 VRP at 3998. Mann went on to state that the demonstration "educates the jury so that they can understand whether or not interpretation presented for certain symptoms are reasonable or not." 20 VRP at 4000. Arndt stated that the demonstrative evidence would be used to show "that data was inconsistent with what you would expect to see there, which would be . . . a burn pattern as opposed to spalling." 20 VRP at 4002.

The trial court excluded evidence of Mann's demonstration. The trial court reasoned that the proffered evidence constituted testing and did not "replicate the situation and the circumstance that we have in this investigation." 20 VRP at 4004. Rather, the evidence compared Mann's conclusions and what he believed spalling or the burn marks would look like to what Lynam testified to, which went beyond the scope of what Mann was allowed to testify about based on the court's prior ruling.

### d. Review of reports

The State moved to exclude Mann's testimony about materials not produced by the fire marshal, such as police reports and coroner's reports. The State argued that such reports were not included in Lynam's file and that Mann's opinions based on such reports were not "based on what all of [the] fire science folks do." 19 VRP at 3745.

---

[11] "Spalling" is the flaking of concrete that occurs when the moisture or the hydrated water in the concrete is forced to evaporate quickly. Such a process may create a dog leg pattern.

The trial court ruled that Mann would not be able to give an opinion that was based on what a police report said, nor would he be able to reference the police reports or coroner's reports. The trial court reasoned that Mann had not shown that experts in the field of evaluating fire investigations reasonably relied on police reports. In an offer of proof, Mann then testified that reports and interviews conducted by law enforcement would be commonly considered in his field. But the trial court stood by its ruling.

### e. Polystyrene test results

In an offer of proof, Mann testified that one of the tests he performed was based on a witness's statement that there was a beanbag in the area by the foosball table. He stated that this test would show the presence of polystyrene, which would be evidence of the beanbag chairs. Mann's testing found polystyrene by the foosball table, but not by the couch. Mann's results from the polystyrene tests were offered to disprove Lynam's hypothesis on origin and cause—that there were beanbag chairs by the foosball table and that one of them was moved near the couch.

The trial court excluded Mann's testimony about the results of his polystyrene testing because

> [if the court] were to allow [Mann] to testify to the polystyrene testing, that effectively allows this witness to go through a fire scene and pick out areas that he believes are important for purposes of this litigation to advance or diminish certain aspects of the scene.
>
> If he were to do an origin and cause, he would need to follow the scientific method and eliminate various hypotheses.
>
> Instead by focusing on one area, which seems to be this foosball area, he's taking one hypothesis and testing it. And not eliminating, under the scientific method, the entire scene. And that was especially evident when asked about the fan. Because he said himself, well, I knew that the investigation was inadequate because the Fire Marshal didn't test the fan.

15

Well, that was apparent. And he said he didn't need to do anything more than that. He didn't pick up the fan to see if it worked.

If his belief that that was enough for him to make the analysis that the fire marshal didn't do the work he needed to do, that same analysis could have been done with the foosball area.

It would have been, well, the Fire Marshal didn't evaluate the foosball area, period. Instead he went a step further. And it is this court's review, in furtherance of litigation to test that area for polystyrene, and that's where he exceeds his limits.

19 VRP at 3651-52.

f. Flashover

Mann testified that "the lowest area of burn, particularly in the case of flashover, may not be the origin of the fire." 20 VRP at 3814. The trial court excluded Mann's opinion as to whether the room in which the fire originated flashed over, but allowed him to testify to the indicators of flashover that he found. Mann testified that

[a]ll this kind—these patterns here are all concrete that chipped up. It means it got very hot. It means we had—and the carpet that overlaid that area was pretty burned up. It was consumed in the fire. It said we had a tremendous amount of energy or a broad area that was radiating down to the floor. We know that doesn't burn as well as newspaper, so we know we had more than 20 kilowatts per square meter of energy, and that is a classic definition of flashover.

20 VRP at 3827-28. Mann also testified that

I believe that that fire scene had practically every post-fire indicator for flashover. And it had many indicators in the sequence, if you look at the timeline of flashover.

So, yes, it had many—there's nothing at all inconsistent with anything about that fire to indicate that it did not go to flashover.

20 VRP at 3894.

16

g.      Smoke visibility

Mann also testified as to the visibility of smoke in the living room at the time of the fire. He stated that he did not see that the fire marshal had considered whether the lights were on or off in the room, whether there was a window covering, or whether there might be light coming in from the window. He also testified that he looked at how apparent smoke would be upstairs and that "[i]t seem[ed] obvious to [him] that there is smoke upstairs." 20 VRP at 3897.

Mann evaluated the hypothesis that Thomas should have noticed smoke in the living room when he walked by the vents by the fireplace. Mann tested the hypothesis by gathering data from online resources about the distance of nearby streetlights, including aerial images of the O'Neil house. In the end, Mann said that he did not have an answer to the hypothesis. The State moved to strike the testimony, but the trial court only issued a warning and did not grant the State's motion.

E.      VERDICT AND SENTENCING

The jury found Arndt guilty as charged. The trial court sentenced Arndt to life in prison without the possibility of parole for her aggravated first degree murder conviction with aggravating circumstances and special allegations of first degree arson, domestic violence, and a particularly vulnerable victim. The trial court did not impose a sentence for her first degree felony murder conviction predicated on first degree arson, but the conviction for first degree felony murder remained in the judgment and sentence. The trial court ordered the sentences for her remaining convictions for first degree arson and second degree assault to run concurrent to the aggravated first degree murder conviction.

Arndt appeals her convictions.

ANALYSIS

A.    STANDARD OF REVIEW

Arndt argues that we should apply a de novo standard of review to the trial court's exclusion of Mann's and Hanson's testimony because the trial court's ruling implicated her constitutional right to present a defense. However, the State argues that an abuse of discretion standard should be applied. We apply the abuse of discretion standard.

The United States Constitution and the Washington State Constitution guarantee defendants the right to present a defense. U.S. CONST. amend. VI, XIV; WASH. CONST. art. I, § 22; *State v. Wittenbarger*, 124 Wn.2d 467, 474, 880 P.2d 517 (1994); *State v. Yokel*, 196 Wn. App. 424, 433, 383 P.3d 619 (2016). Accordingly, a defendant has a "right to present a defense 'consisting of relevant evidence that is not otherwise inadmissible.'" *State v. Mee Hui Kim*, 134 Wn. App. 27, 41, 139 P.3d 354 (2006) (quoting *State v Rehak*, 67 Wn. App 157, 162, 834 P.2d 651 (1992)), *review denied*, 159 Wn.2d 1022 (2007). However, this right does not extend to irrelevant or inadmissible evidence. *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010); *State v. Aguirre*, 168 Wn.2d 350, 363, 229 P.3d 669 (2010).[12]

---

[12] The dissent would hold that the trial court erroneously excluded "crucial, highly probative testimony from Dale Mann." Dissent at 38. However, Mann's excluded testimony failed to satisfy both *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923) and ER 702, as discussed more fully below, and therefore, Mann's excluded testimony was not admissible. Even if "crucial" and "highly probative," expert testimony must meet the Frye test and ER 702 to be admissible. *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 918, 296 P.3d 860 (2013).

Also, the dissent seems to conflate the burden of proof to show admissibility of an expert's testimony under *Frye* and ER 702 with the ultimate burden of proof in a criminal trial. *See* Dissent at 43. Arndt did not argue burden shifting in the trial court or on appeal.

We review a trial court's evidentiary rulings for an abuse of discretion. *State v. Clark*, 187 Wn.2d 641, 648, 389 P.3d 462 (2017).[13] And we defer to the trial court's rulings unless "'no reasonable person would take the view adopted by the trial court.'" *Id.* at 648 (internal quotation marks omitted) (quoting *State v. Atsbeha*, 142 Wn.2d 904, 914, 16 P.3d 626 (2001)).

Here, although Arndt argues her right to present a defense was violated, and thus, a de novo standard applies, the alleged violation occurred as a result of relevancy rulings made by the trial court. As a result, we apply an abuse of discretion standard of review.

B.    EXCLUSION OF EVIDENCE

Arndt argues that the trial court erred by excluding critical evidence that was relevant and admissible, including (1) Mann's testimony regarding a melted bucket, a plastic container, demonstrative evidence, his review of police reports, polystyrene test results, flashover, and smoke visibility; and (2) Craig Hanson's testimony on the fire marshal's policies and procedures. We disagree.

1.    Mann Testimony

The trial court must exclude expert testimony involving scientific evidence unless the testimony satisfies both *Frye and* ER 702. *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909,

---

[13] The dissent appears to agree that "a trial court's ER 702 decision on the admissibility of expert testimony" is reviewed under an abuse of discretion standard and that a defendant has no right to present inadmissible testimony, but the dissent then proposes a "different analysis" when "a criminal defendant offers expert testimony that has high probative value." Dissent at 40, 46, 49. In creating a new evidentiary standard, the dissent appears to ignore the basic premise that if an expert's opinion is not admissible because it fails to meet the requirements of *Frye* and ER 702, then the evidence must be excluded, regardless of its probative value.

918, 296 P.3d 860 (2013).[14] To satisfy *Frye*, "the trial court must find that the underlying scientific theory and the 'techniques, experiments, or studies utilizing that theory' are generally accepted in the relevant scientific community and capable of producing reliable results." *Lakey*, 176 Wn.2d at 918 (internal quotation marks omitted) (quoting *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 603, 260 P.3d 857 (2011)).

Under ER 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," a qualified expert may provide opinion testimony thereto.[15] Such testimony is admissible if it would be helpful to the trier of fact, which is construed broadly. *State v. Morales*, 196 Wn. App. 106, 122, 383 P.3d 539 (2016), *review*

---

[14] The dissent's silence as to Mann's failure to satisfy the requirements of *Frye* seems to imply that the dissent would allow proffered expert testimony if it satisfies the requirements of ER 702, but not *Frye*. That is contrary to our Supreme Court's holding in *Lakey*, 176 Wn.2d at 918.

Also, the dissent concludes that "the State did not object to Mann's testimony based on *Frye*." Dissent at 46. Here, there is no dispute that NFPA 921 is the scientific method followed in a fire investigation. Mann admitted that his review did not follow the methods required by NFPA 921 for the type of review he conducted. And Mann did not conduct an origin and cause investigation following the scientific method set forth in NFPA 921. While the State did not specifically cite to *Frye*, the State did argue that Mann "didn't use the proper methodology, which means his opinions aren't trustworthy." 19 VRP at 3603.

[15] Under ER 703, experts are allowed to base their opinion testimony on facts or data that is not admissible in evidence if it is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." The otherwise inadmissible facts or data underlying an expert's opinion may be admissible for the limited purpose of explaining the basis for an expert's opinion, but it is not substantive evidence. *State v. Wineberg*, 74 Wn.2d 372, 384, 444 P.2d 787 (1968). However, the trial court should not allow expert opinions if the "expert can show only that he customarily relies on such material and if the data are relied on only in preparing for litigation." *In re Det. of McGary*, 175 Wn. App. 328, 340, 306 P.3d 1005, *review denied*, 178 Wn.2d 1020 (2013). In evaluating the underlying facts, the trial court has discretion to determine whether such information is sufficiently reliable to form the basis of the expert's opinion. *Id*.

*denied*, 187 Wn.2d 1015 (2017); *State v. Groth*, 163 Wn. App. 548, 564, 261 P.3d 183 (2011), *review denied*, 173 Wn.2d 1026 (2012). However, ER 702 excludes testimony where the expert fails to adhere to the reliable methodology. *In re Det. of McGary*, 175 Wn. App. 328, 339, 306 P.3d 1005, *review denied*, 178 Wn.2d 1020 (2013). Unreliable testimony is not helpful to the trier of fact and is properly excluded under ER 702. *Id*.

The trial court acts as a gatekeeper with respect to expert testimony and can exclude otherwise admissible evidence if it fails to meet the standards of the applicable rule of evidence. *State v. King County Dist. Court W. Div.*, 175 Wn. App. 630, 638, 307 P.3d 765, *review denied*, 179 Wn.2d 1006 (2013). The trial court has broad discretion in determining the admissibility of an expert's testimony. *McGary*, 175 Wn. App. at 339. And if the basis for the admission or exclusion of expert opinion is fairly debatable, we will not disturb the trial court's ruling. *In re Det. of Coe*, 160 Wn. App. 809, 818, 250 P.3d 1056 (2011).

        a.     Melted bucket by the couch

Arndt argues that the trial court erred when it excluded Mann's testimony about what he saw after lifting a melted bucket found in the area where Lynam concluded was the point of origin. Specifically, Arndt argues that evidence Mann found after moving the melted bucket was relevant because it would have disproved Lynam's hypothesized ignition sequence, and thus was admissible. We disagree.

Relevant evidence is only admissible if it is not excluded by another rule. ER 402. And expert testimony may be excluded where the expert fails to adhere to the reliable methodology. *McGary*, 175 Wn. App. at 339. The methodology for conducting an origin and cause investigation was to follow the scientific method in NFPA 921, which involved (1) recognizing the need or

assignment, (2) defining the problem, (3) collecting data, (4) analyzing the data and testing probable hypotheses to prove or disprove the different hypotheses, and (5) determining the final theory.

Here, Mann stated that he was hired only to review Lynam's origin and cause investigation. In his review, Mann admitted that most fire investigators would not conduct the type of review he did and that he did not follow the methodology required by NFPA 921. Mann also admitted that he did more than a review of Lynman's investigation. Mann conducted selective testing solely for the purpose of litigation, and he did not follow the scientific method required by NFPA 921 in doing so. The trial court did not find Mann's testimony about origin and cause to be reliable. As a result, the trial court limited Mann's testimony about the melted bucket to his actual observations. Such a limitation was proper as *Frye* requires the trial court to find that "the underlying scientific theory and the 'techniques, experiments, or studies utilizing that theory' are generally accepted in the relevant scientific community and capable of producing reliable results." *Lakey*, 176 Wn.2d at 918 (internal quotation marks omitted) (quoting *Anderson*, 172 Wn.2d at 603).[16] Arndt failed to show Mann satisfied this requirement.

Arndt also argues that the evidence was admissible through Mann as a fact witness because it was within his personal knowledge, and it was admissible as the underlying factual basis for his

---

[16] The dissent relies on *Colley v. PeaceHealth*, 177 Wn. App. 717, 312 P.3d 989 (2013), as a "more applicable civil case" than *Lakey*. Dissent at 45. We respectfully disagree because Colley did not address the issue of whether a proffered expert's testimony is admissible when it fails to meet the standard set forth in *Frye* and ER 702. Rather, the issue in *Colley* was whether the trial court erred in denying a motion to exclude experts' testimony when the experts had no opinions on causation. 177 Wn. App. at 727-28.

conclusions on Lynam's investigation. However, Mann was more than a fact witness. Arndt proffered Mann as an expert that would testify to the significance of the melted bucket's presence, his findings related thereto, and how those findings disproved Lynam's hypothesis as to cause and origin of the fire. This would have required specialized knowledge. *See* ER 702.

Regardless, Mann was allowed to testify that he saw a melted bucket and why he thought the melted bucket was significant. Mann testified that he observed the remnants of a melted plastic bucket by the east end of the couch and that the remnants protected the floor; that such buckets were made of polyethylene and that polystyrene is the material in beanbag chairs; that polystyrene survives fire better than polyethylene; and that if the bucket survived, he would have expected the polystyrene pool of liquid from the beanbag chair to as well.

Thus, even though Mann was not allowed to testify about what he saw after he physically manipulated the melted bucket, Mann was allowed to testify as to why he thought the melted bucket was important. We hold that the trial court did not abuse its discretion in ruling that Mann could not testify to his lifting the melted bucket and what he saw after lifting that bucket.

b.     Plastic container by the hearth and other debris

Arndt argues that the trial court erred when it precluded Mann from testifying about a plastic container that he found by the hearth, along with other debris. We disagree.

Mann testified that he found remnants of a plastic container and other debris by the hearth downstairs. Mann said that the plastic was stuck to the floor and did not move if you nudged it. The trial court reminded Mann that his testimony was not to go into testing or manipulation. No further questions were asked regarding the plastic container or other debris.

While the trial court reminded Mann about the court's rulings as to the scope of his testimony, the trial court did not expressly exclude any testimony by Mann. Therefore, there is no trial court ruling for this court to review.

c.  Demonstrative exhibit

Arndt argues that the trial court erred when it excluded evidence of a demonstration that Mann performed, and the related testimony and photographs. We disagree.

The use of demonstrative or illustrative evidence is favored, and the trial court has wide latitude in deciding to admit or exclude demonstrative evidence. *In re Pers. Restraint of Woods*, 154 Wn.2d 400, 426, 114 P.3d 607 (2005). Such evidence is admissible if the experiment was conducted under substantially similar conditions as the event at issue. *State v. Hultenschmidt*, 125 Wn. App. 259, 268, 102 P.3d 192 (2004). Determining whether the similarity is sufficient is within the trial court's discretion, and the trial court's decision will not be disturbed on appeal absent an abuse of discretion. *State v. Finch*, 137 Wn.2d 792, 816, 975 P.2d 967 (1999) (plurality opinion).

Here, the trial court excluded evidence of Mann's demonstration because it was testing and did not "replicate the situation and the circumstance that we have in this investigation." 20 VRP at 4004. This rationale was within the trial court's discretion.

While Arndt argues that the purpose of the demonstrative evidence was to show a general principle and was not a re-creation of the fire conditions, defense counsel stated that the evidence would be used to show "that data was inconsistent with what you would expect to see there, which would be . . . a burn pattern as opposed to spalling." 20 VRP at 4002. This showed that the evidence was not only sought to be introduced to show a general principle, but also to prove what should have occurred. But the demonstration involved a carpet with an ignitable liquid lit on fire

and packing peanuts that were lit on fire. As a result, the trial court found that the conditions of the experiment were not similar to those in this case. Arndt fails to show that the trial court abused its discretion in excluding this evidence.

    d.  Review of reports

  Arndt next argues that the trial court erred when it excluded Mann's opinions drawn from his review of police reports and coroner's reports as a part of his evaluation of Lynam's investigation. We agree but hold that the error was harmless.

    i.  Testimony admissible

  "Expert testimony is admissible if the witness's expertise is supported by the evidence, his opinion is based on material reasonably relied on in his professional community, and his testimony is helpful to the trier of fact." *Deep Water Brewing, LLC v. Fairway Res. Ltd.*, 152 Wn. App. 229, 271, 215 P.3d 990 (2009), *review denied*, 168 Wn.2d 1024 (2010). Such was the case with regard to the police and coroner's reports.

  The trial court ruled that Mann would not be able to give an opinion that was based on what a police report said, nor be able to reference the police reports or coroner's reports. The trial court reasoned that Mann had not shown that experts in the field of evaluating fire investigations reasonably relied on police reports under ER 703. But in an offer of proof, Mann testified that reports and interviews conducted by law enforcement would be commonly considered in his field. Mann's expertise was supported by his testimony on his experience and certifications, police reports were established as reasonably relied upon in his professional community through Mann's offer of proof, and Mann's testimony regarding the reports would help the jury understand the basis of his opinion.

Thus, the evidence was relevant, and the trial court should have admitted Mann's opinion testimony based on the police reports and coroner's reports. A defendant has a "right to present a defense 'consisting of relevant evidence that is not otherwise inadmissible.'" *Mee Hui Kim*, 134 Wn. App. at 41 (quoting *Rehak*, 67 Wn. App at 162).

ii.     Harmless error

"An erroneous evidentiary ruling that violates the defendant's constitutional rights . . . is presumed prejudicial unless the State can show the error was harmless beyond a reasonable doubt." *State v. Franklin*, 180 Wn.2d 371, 377 n.2, 325 P.3d 159 (2014). An error is harmless beyond a reasonable doubt if there is no reasonable doubt that the jury would have arrived at the same verdict if it was allowed to hear the excluded evidence. *Id*. at 383. The State can show the error was harmless here.

Arndt argues that the trial court's exclusion prevented her from having Mann point out that Lynam reached his conclusions before reviewing all the available information, having Mann explain that Lynam ignored discrepancies upon review of the material, and made Mann seem less thorough than the other experts that testified they reviewed such reports. But the jury already knew that Lynam reached his conclusions before reviewing all the available information. Lynam testified that he did not complete the review of the entire case file from the sheriff's office before generating his report.

Furthermore, while there were discrepancies that existed within the police reports that Mann could have pointed out—regarding Thomas's statements on who was a smoker in the house and who tried to get the fire going again the night of the fire—the discrepancies were apparent to the jury. Thomas testified that he and Veeder tried getting the fire going again, while Lynam

testified that Thomas told him that Arndt and Thomas tried to restart the fire. Also, the discrepancies were insignificant to the ultimate origin and cause determination because Lynam's testing ruled out the hypothesis of smoking or an ember from the fireplace upstairs as causes of the fire.

As for Arndt's contention that the exclusion made Mann seem less thorough than the other experts, Mann conducted a different review than the other experts and he did not testify to the materials that he did in fact review. The jury would thus have no reason to believe that Mann did or did not review such materials or question the thoroughness of his investigation. Thus, there is no reasonable doubt that the jury would have reached the same verdict even if it had heard the excluded evidence. Therefore, the trial court's failure to admit Mann's testimony as to his review of police reports was harmless beyond a reasonable doubt.

e.      Polystyrene test results

Arndt argues that the trial court erred when it excluded the results of Mann's polystyrene tests. We disagree.

In Arndt's offer of proof, Mann testified that he was hired only to review Lynam's fire investigation. He did not perform an origin and cause investigation. Mann stated that his evaluation of Lynam's fire investigation could be done by reviewing the documentation in the investigative file alone. However, for purposes of litigation, he went to the scene, collected additional data at the scene, and tested selected hypotheses in the investigative file. One of these tests relied on an unverified witness statement pertaining to the presence of beanbag chairs by the foosball table. He found polystyrene by the foosball table, but not by the couch. Mann's results

from the polystyrene tests were offered to disprove Lynam's hypothesis on origin and cause—that there were beanbag chairs by the foosball table and that one of them was moved near the couch.

Arndt argues that Mann's testimony about the results of his polystyrene testing was relevant and admissible, and was helpful to the jury as a piece of information underlying his ultimate conclusion. However, Mann did not conduct an origin and cause investigation, for which a reliable methodology had been established. There was no testimony to establish that experts conducting the type of review Mann conducted would visit the fire scene, collect additional data, and test selected hypotheses developed by the fire investigators. Furthermore, Mann admitted that most fire investigators would not conduct the type of review he did in this case. Mann went beyond just a file review for the purpose of litigation.

Mann's investigation and testing methodology was not established as the type of methods reasonably relied upon by experts in the field and, thus, was properly excluded. Under the circumstances presented, we hold that the trial court did not abuse its discretion in excluding Mann's testimony about his polystyrene test results.

f.     Opinion of flashover

Arndt argues that the trial court erred when it excluded Mann's opinion that flashover had occurred. We disagree.

Here, Mann testified that "the lowest area of burn, particularly in the case of flashover, may not be the origin of the fire." 20 VRP at 3814. In accordance with its prior ruling, the trial court excluded Mann's opinion as to whether the room in which the fire originated flashed over. Because Mann did not conduct an origin and cause investigation, following a reliable

methodology, his opinion on flashover, which related to the origin of the fire, was properly excluded. *McGary*, 175 Wn. App. at 339.

While Arndt argues that Mann's opinion that flashover occurred would have been helpful to the jury under ER 702, unreliable testimony is not helpful to the jury and is properly excluded. *Id.* Mann's failure to conduct an origin and cause investigation following NFPA 921 meant that he did not apply the reliable methodology required to give an opinion on the origin and cause, which included an opinion on flashover.

Arndt suggests that without Mann's opinion, "the jury was left with the weight of the testimony suggesting that flashover had not occurred." Br. of Appellant at 35. However, the record shows that Mann did in fact testify that flashover occurred.

During trial, Mann described the conditions he saw and noted "that is a classic definition of flashover." 20 VRP at 3828. Mann also testified that he believed the scene had "practically every post-fire indicator for flashover" and "there's nothing at all inconsistent with anything about that fire to indicate that it did not go to flashover." 20 VRP at 3894. Thus, Mann's statements, especially that "there's nothing at all inconsistent with anything about that fire to indicate that it did not go to flashover," were expressions of his opinion that flashover occurred and were admitted.

g.      Visibility of smoke in the living room

Arndt contends that the trial court erred when it excluded Mann's testimony regarding the visibility of smoke coming through the vent into the living room and precluded him from outlining information he obtained and analyzed to reach a conclusion. However, this contention is factually meritless as Mann testified on the subject and presented the information that he gathered.

Mann testified that, in the fire marshal's report, Mann did not see any consideration of whether the lights were on or off in the room, whether there was a window covering in the living room, or whether there might be light coming in from outside the house. He also testified that he looked at how apparent smoke would be upstairs and that "[i]t seem[ed] obvious to [him] that there is smoke upstairs." 20 VRP at 3897. Mann evaluated the hypothesis that Thomas should have noticed smoke when he walked by the vents by the fireplace in the living room and testified to the data he gathered about nearby streetlights. In the end, Mann said that he did not have an answer. The State moved to strike the testimony, but the trial court only issued a warning and did not grant the State's motion. Given this record, Arndt's contention fails.

h.     Opening the door

Arndt argues that the State opened the door to Mann's testimony by presenting Iskra's and Rice's testimony. She alleges that Iskra and Rice conducted the same kind of investigation and review that Mann did. We disagree.

Here, both Iskra and Rice conducted origin and cause investigations. But Mann was clear that he did not conduct an origin and cause investigation following the scientific method.

As stated above, in order to determine where a fire started, NFPA 921 requires that the scientific method must be followed. Because Iskra and Rice conducted origin and cause investigations, used NFPA 921, and applied the scientific method in conducting their investigations, they could testify to the tests they completed and give an opinion on the origin and cause of the fire. However, Mann did not conduct such an investigation. And while Rice also conducted a technical review, Mann did not conduct such a review either. The method required to be followed for the type of review Mann conducted is in NFPA 921. Mann characterized his

30

review as a mix between peer review and technical review and admitted that most fire investigators would not conduct the type of inquiry he did in this case. Thus, Arndt's comparison of the work done by Mann and that done by Iskra and Rice, is not persuasive.

Arndt complains that Iskra conducted only a partial origin and cause investigation at the scene because Iskra was stopped short in his investigation of origin and cause. However, Iskra was able to determine the point of origin and likely cause based on the information Lynam provided. Therefore, Arndt's argument fails.[17]

2.      Craig Hanson

Arndt argues that the trial court erred when it excluded Hanson's testimony on the fire marshal's policies and procedures followed when he was employed in the fire marshal's office. We disagree.

Under ER 701, a witness not testifying as an expert, may not give his or her opinion that is based on scientific, technical, or other specialized knowledge. In order to give an opinion based on such specialized knowledge, the knowledge must be helpful to the jury and the witness needs to be qualified as an expert. ER 702.

Here, Hanson was not identified as an expert on proper fire marshal procedures. Thus, the trial court did not abuse its discretion in excluding Hanson's testimony about any deficiencies of the procedures in place during his employment at the fire marshal's office. *See* ER 701, 702.

---

[17] Arndt also argues that the trial court's decision excluding portions of Mann's testimony rested on a misunderstanding of the law. But the trial court's rulings, outside of its ruling regarding the review of police reports, were proper based on *Frye* (melted bucket and plastic container), the differences between the conditions of the experiment and those in this case (demonstrative exhibit), and ER 702 and ER 703 (melted bucket, plastic container, polystyrene test results, and opinion of flashover). Therefore, Arndt's argument fails.

Furthermore, Arndt agreed that Hanson did not have facts specific to this case. Hanson was not employed by the fire marshal's office during the investigation in this case. Thus, the relevance of Hanson's testimony was diminished as he would have provided no information on the actual procedures implemented during the investigation. Also, Hanson had no knowledge about the current practices of the fire marshal's office. *See State v. Prestegard*, 108 Wn. App. 14, 20, 20 n.4, 28 P.3d 817 (2001). Under these circumstances, the trial court did not abuse its discretion in excluding Hanson's testimony.

C.    DOUBLE JEOPARDY[18]

Arndt argues that the trial court violated her constitutional right to be free from double jeopardy by (1) entering both a conviction for aggravated first degree murder aggravated by first degree arson and first degree felony murder predicated on first degree arson, and (2) entering both a conviction for aggravated first degree murder and first degree arson. We agree that Arndt's right to be free from double jeopardy was violated in this case by the entering of a conviction for aggravated first degree murder and first degree felony murder.

The right to be free from double jeopardy protects a defendant from being punished multiple times for the same offense. *State v. Fuller*, 185 Wn.2d 30, 33-34, 367 P.3d 1057 (2016). We apply a three-step analysis to determine whether the legislature authorized multiple punishments for a single course of conduct. *State v. Thompson*, 192 Wn. App. 733, 737, 370 P.3d 586, *review denied*, 185 Wn.2d 1041 (2016). First, we consider the legislative intent based on the

---

[18] An issue may only be raised for the first time on appeal if it involves a manifest error affecting a constitutional right. RAP 2.5(a)(3). Because double jeopardy claims present issues involving a manifest error affecting a constitutional right, Arndt may raise her claim for the first time on appeal. *State v. Tanberg*, 121 Wn. App. 134, 137, 87 P.3d 788 (2004).

criminal statutes involved. *Id*. Second, if the statute is silent, we apply the "same evidence" test, which asks whether, as charged, each offense includes elements not included in the other and whether proof of one offense would also prove the other. *Id*. Third, if applicable, we may apply the merger doctrine to determine legislative intent, "where the degree of one offense is elevated by conduct constituting a separate offense." *Id*. at 737-38. In such situations, we presume "the legislature intended to punish both offenses through a greater sentence for the greater crime. *State v. Freeman*, 153 Wn.2d 765, 773, 108 P.3d 753 (2005). However, if two convictions appear to merge, they may still be punished separately if there is an independent purpose or effect for each offense. *In re Pers. Restraint of Francis*, 170 Wn.2d 517, 523, 242 P.3d 866 (2010). We review claims of double jeopardy de novo. *Fuller*, 185 Wn.2d at 34.

1.      Aggravated First Degree Murder and First Degree Felony Murder

Arndt argues, and the State concedes, that the trial court violated her constitutional right to be free from double jeopardy by entering both a conviction for aggravated first degree murder and first degree felony murder based on the same conduct. We accept the State's concession.

Here, the legislature intended for the conduct underlying Arndt's murder convictions to be punished as a single offense, as evidenced by the statutes involved. *Thompson*, 192 Wn. App. at 737. Both convictions are based on the same statute, RCW 9A.32.030(1), within which subsection (a) and (c) provide for an alternative means to find a person guilty of first degree murder. Therefore, we accept the State's concession and vacate Arndt's first degree felony murder conviction.

2.      Aggravated First Degree Murder and First Degree Arson

Arndt argues that the trial court violated her constitutional right to be free from double jeopardy by entering convictions for aggravated first degree murder based on a first degree arson aggravator and first degree arson. We disagree.

Under RCW 9A.32.030(1)(a), a person is guilty of first degree murder when he or she causes the death of another person with premeditated intent to cause the death of such person or a third person. When such a murder is committed in the course of, in furtherance of, or in immediate flight from a first degree arson, the person is guilty of aggravated first degree murder, which warrants a sentence of life in prison without parole or death. RCW 10.95.020(11)(e), 030. Aggravated first degree murder "'is not a crime in and of itself; the crime is *premeditated* murder in the first degree . . . accompanied by the presence of one or more of the statutory aggravating circumstances listed in the criminal procedure title of the code (RCW 10.95.020).'" *State v. Thomas*, 166 Wn.2d 380, 387, 208 P.3d 1107 (2009) (alterations in original; internal quotation marks omitted) (quoting *State v Roberts*, 142 Wn.2d 471, 501, 14 P.3d 713 (2000)).

Under RCW 9A.48.020(1), a person is guilty of first degree arson when he or she:

    (a) Causes a fire or explosion which is manifestly dangerous to any human
life, including firefighters; or
    (b) Causes a fire or explosion which damages a dwelling; or
    (c) Causes a fire or explosion in any building in which there shall be at the
time a human being who is not a participant in the crime.

Here, based on her conduct on February 23, 2014, Arndt was convicted of aggravated first degree murder with a first degree arson aggravating circumstance and first degree arson. But an aggravated first degree murder charge is not a crime in and of itself. *Id*. Rather, the crime is first degree premeditated murder, and the aggravators are not charged offenses for the purpose of

double jeopardy. *Id.*; *State v. Kincaid*, 103 Wn.2d 304, 307, 692 P.2d 823 (1985) (aggravating factors are not elements of first degree murder). As a result, the double jeopardy clause is not violated by entering a conviction for aggravated first degree murder with a first degree arson aggravating circumstance and a conviction for the crime of first degree arson.

3.      Same Evidence and Merger Doctrine

Arndt also argues that the same evidence test and the merger doctrine support a finding of double jeopardy. Arndt's arguments are unpersuasive.

a.  Same evidence

Under the same evidence test, we ask whether, as charged, each offense includes elements not included in the other and whether proof of one offense would also prove the other. *Thompson*, 192 Wn. App. at 737. But aggravating factors are not elements of first degree murder. *Kincaid*, 103 Wn.2d at 307. Therefore, the same evidence test is inapplicable here.

Arndt further argues that if "the evidence necessary to convict the accused person on one offense also proves guilt on the other," then the double jeopardy clause prohibits convictions for both offenses. Br. of Appellant at 50. Arndt misstates the law.

Double jeopardy requires that the two offenses be the same in fact and in law. *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 820, 100 P.3d 291 (2004). Here, the two crimes are not the same in law. Aggravated first degree murder with a first degree arson aggravating circumstance requires proof that the murder was committed in the course of, in furtherance of, or in immediate flight from a first degree arson. RCW 10.95.020. However, first degree arson requires proof that a defendant actually completed the crime of first degree arson. RCW 9A.48.020. Because a first degree arson aggravating circumstance can be proven by a defendant's conduct in furtherance of

a first degree arson, the completed crime of first degree arson does not need to be proven. *See, e.g.*, *State v. Brett*, 126 Wn.2d 136, 170, 892 P.2d 29 (1995) (in regards to robbery and kidnapping). Therefore, the two crimes are not the same in law.

           b.  Merger doctrine

Arndt also contends that the merger doctrine applies to the two crimes. The merger doctrine "determine[s] whether the legislature authorized multiple punishments for one course of conduct." *Thompson*, 192 Wn. App. at 737. The merger doctrine applies "where the degree of one offense is elevated by conduct constituting a separate offense." *State v. Kier*, 164 Wn.2d 798, 804, 194 P.3d 212 (2008). In such situations, we presume "the legislature intended to punish both offenses through a greater sentence for the greater crime." *Freeman*, 153 Wn.2d at 773.

In terms of the merger doctrine, Arndt's conduct constituting first degree arson did not elevate the degree of her premeditated murder charge. Rather, it merely added an aggravating circumstance to the charge of premeditated murder. *See Thomas*, 166 Wn.2d at 387. Therefore, the merger doctrine is inapplicable.

Thus, we hold that Arndt's right to be free from double jeopardy was not violated by the entering of convictions for aggravated first degree murder with a first degree arson aggravator and first degree arson. Arndt's double jeopardy claim fails.

APPELLATE COSTS

Arndt argues that we should decline to impose appellate costs against her if the State substantially prevails on this appeal and makes a proper request. The State asserts that it will not request appellate costs if it substantially prevails on appeal. Accordingly, we do not impose appellate costs.

36

No. 48525-7-II

We remand this case back to the trial court to vacate Arndt's first degree felony murder conviction, but we affirm the remaining convictions.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Lee, J.

I concur:

_____
Sutton, J.

No. 48525-7-II

MAXA, A.C.J. (dissenting) – I dissent because the trial court erroneously excluded crucial, highly probative testimony from Dale Mann, Shelly Arndt's fire investigation expert. The trial court's rulings constituted both an abuse of discretion under ER 702 and a violation of Arndt's constitutional right to present a defense.

BACKGROUND

David Lynam, the Kitsap County Fire Marshall, performed a full origin and cause investigation of the fire that killed Darcy Veeder, Jr. Lynam provided an opinion that the fire's point of origin was the northeast corner of a couch in the downstairs family room.

Lynam also developed a hypothesis that the cause of the fire was the ignition of a beanbag chair near the couch. Lynam tested the hypothesis by igniting a beanbag chair with a handheld flame and observing how the beanbag chair burned. He concluded that a beanbag chair was combustible and could have been placed on or near the couch and ignited by a handheld flame, and that the beanbag chair was a competent fuel source for igniting the couch. Based on his testing of the beanbag chair, Lynam reached an opinion that the fire was ignited by application of a handheld flame to combustibles placed near the corner of the couch.

The State's two other experts, Ed Iskra and Kenneth Rice, also stated opinions that the origin of the fire was the corner of the couch and that the ignition source was an open flame.

In addition, Lyman, Iskra and Rice all agreed that the scientific methodology outlined in National Fire Protection Association (NFPA) 921 should be followed in performing an origin and cause investigation.

Arndt retained Mann as an expert witness. It is undisputed that Mann has a high level of expertise and extensive training and experience regarding fire and arson investigations. Mann

38

conducted a review of Lynam's investigation and critiqued certain aspects of that investigation. Mann acknowledged that he did not perform an origin and cause investigation using the methodology outlined in NFPA 921, because he was not giving an opinion regarding a particular cause or origin. Instead, Mann was challenging Lynam's opinions regarding the cause of the fire based on Mann's review of the investigation materials, his own observations at the scene, and certain testing. He believed that Lynam should have classified the cause of the fire as undetermined.

The trial court precluded Mann from testifying regarding any "testing" he performed regarding the fire because he had not conducted a complete origin and cause investigation under NFPA 921. As a result, the court excluded testimony that (1) Mann had lifted remnants of a plastic bucket stuck to the floor near Lynam's proposed point of origin to determine if the bucket had been present at the time of the fire and (2) Mann had performed tests to detect the presence of polystyrene, the material in bean bag chairs, both around Lynam's proposed point of origin and in a separate area, to determine if igniting a beanbag chair could have been the cause of the fire.

## ANALYSIS

The trial court made a clearly erroneous ruling that Mann could not testify about any "testing" he performed to evaluate Lynam's opinions regarding the origin and cause of the fire unless he performed a complete cause and origin investigation. The majority inexplicably affirms this ruling.

The trial court committed reversible error even under the deferential abuse of discretion standard for ER 702 rulings regarding expert testimony. But the trial court's error was even

more egregious here because excluding Mann's highly probative testimony violated Arndt's constitutional right to present a defense.

A.    ADMISSIBILITY UNDER ER 702

Mann's testimony about the plastic bucker remnants and the polystyrene testing obviously was relevant and would have been helpful to the jury.  No authority supports the trial court's ruling that Mann's testimony was inadmissible under ER 702 unless he conducted a full-blown origin and cause investigation.

1.    Legal Principles

In general, ER 702 governs the admissibility of expert testimony.  *State v. Green*, 182 Wn. App. 133, 146, 328 P.3d 988 (2014).  Under ER 702, a qualified expert may testify in the form of an opinion "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."

Based on this standard, "[e]xpert testimony is usually admitted under ER 702 if it will be helpful to the jury in understanding matters outside the competence of ordinary lay persons." *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 600, 260 P.3d 857 (2011).  Expert testimony is not helpful to the jury unless it is relevant.  *State v. Greene*, 139 Wn.2d 64, 73, 984 P.2d 1024 (1999).  And unreliable evidence necessarily is not helpful to the jury.  *Anderson*, 172 Wn.2d at 600.  But courts favor the admissibility of expert testimony if helpfulness to the jury is fairly debatable, even if helpfulness is somewhat doubtful.  *In re Det. of Pettis*, 188 Wn. App. 198, 205, 352 P.3d 841 (2015).

Courts generally review a trial court's ER 702 decision on the admissibility of expert testimony under an abuse of discretion standard.  *Green*, 182 Wn. App. at 146.

2.    ER 702 Analysis

Mann offered testimony regarding two crucial issues that he believed called into question Lynam's opinion that applying an open flame to a beanbag chair near the couch caused the fire.

First, when Mann was at the scene he observed the remnants of a plastic (polyethylene) bucket bottom near Lynam's proposed point of origin. The remnants were stuck to the floor, and Mann had to detach them with a shovel. The fact that the remnants were stuck to the floor showed that the bucket had been heated in that location and therefore had been present at the time of the fire.

The existence of the bucket remnants was significant to Mann because polyethylene has a significantly lower melting point than polystyrene, the material in bean bag chairs. This means that the bucket would have been consumed more readily that the bean bag chair. If the bucket remnants survived the fire, the bean bag chair also would have survived the fire. But there was no physical evidence of a beanbag chair in that location. On this basis, Mann was prepared to testify that there was no evidence to support Lynam's hypothesis that the fire was caused when a beanbag chair was placed next to the couch and ignited.

Second, Mann performed tests to detect the presence of polystyrene in the room where the fire started. He tested for polystyrene both around the couch area where the fire started and around a foosball table on the other side of the room where a witness stated a bean bag chair had been located. Mann's testing found polystyrene by the foosball table, but not in the couch area. Mann was prepared to testify that these polystyrene tests showed that Lynam's opinion – that the

fire started when someone ignited a bean bag chair near the couch – was not supported by the data.[19]

Mann's testimony obviously was relevant. The presence of the bucket remnants and the absence of polystyrene near the couch called into question Lyman's opinion regarding the cause of the fire. And Mann's testimony was "helpful to the jury in understanding matters outside the competence of ordinary lay persons." *Anderson*, 172 Wn.2d at 600. A jury would have no knowledge regarding the significance of bucket remnants or polystyrene testing in determining the cause of the fire.

Nevertheless, the trial court excluded this relevant and helpful testimony. The court ruled that because Mann did not perform a complete origin and cause investigation, he could not offer any testimony regarding selective investigation and testing that he performed. The court stated that Mann could not be considered reliable as an investigator if he did not perform an origin and cause investigation.

The court's rationale was that Mann could not "pick and choose" what aspects of the fire scene to investigate and test; that a fire expert cannot "go through a fire scene and pick out areas that he believes are important for purposes of this litigation to advance or diminish certain aspects of the scene." 19 Verbatim Report of Proceedings (VRP) at 3651. The court objected to Mann "focusing on one area" and "taking one hypothesis and testing it" rather than addressing

---

[19] The trial court also improperly excluded other portions of Mann's testimony, most significantly that Mann had layered areas within the room where the fire started that Lynam apparently did not inspect. Mann would have testified that these uninspected areas showed the inadequacy of Lynam's investigation.

the entire scene under the scientific method for performing an origin and cause investigation. 19 VRP at 3651.

In addition, the court determined that detaching the bucket remnants constituted "testing." Therefore, the court precluded Mann from giving his opinion that the bucket had been present at the time of the fire. This ruling was significant because Iskra testified on rebuttal that the bucket remnants had not been present when he investigated the scene after the fire. Mann's excluded testimony would have contradicted Iskra's testimony.

The trial court's ruling demonstrates a misunderstanding of the role of a defense expert in a criminal trial. In a first degree arson case, the State has the burden of proving beyond a reasonable doubt that the defendant knowingly caused the fire. RCW 9A.48.020(1). There is no question that the State must conduct a complete origin and cause investigation using the established scientific methodology in order to sustain this burden.

But a defendant is not required to prove anything. *See State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). Likewise, "the defendant cannot be compelled to produce evidence to disprove an element." *State v. Deer*, 175 Wn.2d 725, 733, 287 P.3d 539 (2012). As a result, a defendant in an arson case certainly has no burden to establish any particular origin or cause of the fire. By requiring a defense expert to perform a complete origin and cause investigation as a prerequisite to allowing relevant and helpful testimony, the trial court in effect imposed a burden on Arndt to develop her own theory for how the fire started before Mann could testify. Such a burden is improper under ER 702, which asks only whether an expert's proposed testimony is helpful to the jury. *Anderson*, 172 Wn.2d at 600.

Further, a defense expert in a criminal case necessarily must be allowed to "pick and choose" which aspects of the State's case to investigate and test. Because the defendant cannot be compelled to testify, a defendant's entire case may consist of attempting to create a reasonable doubt by challenging selected aspects of the State's case. A defense expert's role often involves nothing more than selectively "poking holes" in the opinions of the State's experts. There is nothing improper about a defense expert choosing particular issues to challenge for litigation purposes or performing selected testing. That is a defense expert's role.

In the trial court, the State repeatedly referenced *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 296 P.3d 860 (2013), in urging the court to exclude portions of Mann's testimony. But this case is distinguishable. In *Lakey*, the plaintiffs filed a lawsuit alleging that electromagnetic fields (EMFs) emanating from a Puget Sound Energy substation were injurious to their health. *Id.* at 914. The plaintiffs' expert concluded that EMFs were a possible cause of various diseases and medical problems. *Id.* at 915. But the expert admitted that when performing a literature review, he discounted studies and data that showed no EMF-disease link and did not consider any toxicological studies that measured the incidence of disease in animals. *Id.* at 916.

The Supreme Court affirmed the trial court's exclusion of the expert's testimony. *Id.* at 920-21. The expert had failed to consider all the relevant studies regarding links between EMF and health concerns, refused to account for toxicological studies, and selectively sampled data within one of the studies he used. *Id.* The court stated that the expert "failed to follow proper methodology, rendering his conclusions unreliable and therefore inadmissible." *Id.*

*Lakey* is inapplicable here because in that case, the expert had developed an affirmative

opinion regarding causation. In addition, the expert was testifying for the plaintiffs, who had the

burden of proving a connection between EMFs and health concerns. Here, Mann repeatedly

stated that he did not have an opinion regarding the cause of the fire. Instead, he simply stated

that data did not support Lynam's proposed cause. And he was the expert for the defendant, who

had no burden of proof.[20]

A more applicable civil case is *Colley v. PeaceHealth*, 177 Wn. App. 717, 312 P.3d 989

(2013). In *Colley*, the plaintiff in a medical negligence action alleged that he had suffered

memory loss after an episode of respiratory failure. *Id.* at 720-21. The plaintiff argued that the

trial court erred in allowing the testimony of a defense expert who identified several factors

besides oxygen deprivation that could have caused the plaintiff's memory loss but did not state

an opinion regarding causation. *Id.* at 727-28. The plaintiff claimed that the expert testimony

should not have been admitted "unless [the expert] was prepared to say either that respiratory

failure was not the cause of [the plaintiff's] injury or that something else was the cause." *Id.* at

728.

The appellate court disagreed with the plaintiff's argument. The court stated that "[i]t is

the plaintiff's burden in a medical negligence action to prove the statutory elements, including

breach and causation. . . . The defendant does not have the burden to prove causation or lack of

---

[20] In the trial court, the State relied on two other cases: *In re Detention of McGary*, 175 Wn. App. 382, 306 P.3d 1005 (2013), and *Davidson v. Municipality of Metropolitan Seattle*, 43 Wn. App. 569, 719 P.2d 569 (1986). However, the facts of those cases have no similarity to the facts in this case and clearly are inapplicable.

causation." *Id.* at 728-29. The court emphasized that the expert testimony attacked the premise suggested by the plaintiff's experts, that the plaintiff's memory loss must have been caused by oxygen deprivation. *Id.* at 729. Instead of trying to establish a cause, the expert's testimony was offered to show that the plaintiff lacked proof of causation. *Id.* As a result, the expert's testimony was properly admitted. *Id.*

While discussing admissibility under ER 702, the majority references the *Frye*[21] test, which evaluates whether an expert's testimony based on a novel scientific theory is generally accepted in the relevant scientific community. *Anderson*, 172 Wn.2d at 600-01. But the State did not object to Mann's testimony based on *Frye* and the trial court did not base its ruling on *Frye*. And there is no indication that Mann's opinions regarding the bucket remnants or polystyrene testing somehow reflect novel or unaccepted views.

I would hold that the trial court abused its discretion under ER 702 in excluding portions of Mann's testimony.

B.      CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE

Arndt's primary argument is that the trial court violated her constitutional right to present a defense by excluding portions of Mann's testimony. The majority brushes aside this argument and applies a basic ER 702 analysis under an abuse of discretion standard. However, the right to present a defense demands a different analysis when a criminal defendant offers expert testimony that has high probative value. This different analysis further confirms that the trial court erred in excluding portions of Mann's testimony.

---

[21] *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

1.    Legal Principles

A criminal defendant has a constitutional right to present a defense. *State v. Jones*, 168 Wn.2d 713, 719-20, 230 P.3d 576 (2010). This right to present a defense derives from the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution. *State v. Jefferson*, 199 Wn. App. 772, 800, 401 P.3d 805 (2017). There also is a fundamental due process right to present a defense under the Fourteenth Amendment. *State v. Lizarraga*, 191 Wn. App. 530, 551-52, 364 P.3d 810 (2015).

A defendant's right to present a defense, including the opportunity to offer testimony, "is basic in our system of jurisprudence." *Jones*, 168 Wn.2d at 720. " '[I]n plain terms the right to present a defense[ is] the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies.' " *Lizarraga*, 191 Wn. App. at 552 (alterations in original) (quoting *Taylor v. Illinois*, 484 U.S. 400, 409, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988)).

To be sure, a defendant has no absolute right to present testimony that is inadmissible under standard evidence rules. *Jefferson*, 199 Wn. App. at 801. The right to present a defense is subject to " 'established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocent.' " *Id.* (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)). For example, a defendant's evidence must at least have minimal relevance; there is no constitutional right to present irrelevant evidence. *Jones*, 168 Wn.2d at 720.

In *Jones*, the Supreme Court stated that under the right to present a defense, a defendant generally must be allowed to present even minimally relevant evidence unless the State shows

that the evidence is so prejudicial as to disrupt the fairness of a fact-finding process at trial and that the State's interest in excluding the prejudicial evidence outweighs the defendant's need for that evidence. *Id.* Further, the court emphasized that no state interest is compelling enough to preclude evidence of "*high* probative value." *Id.*

When the defendant's evidence is highly probative, the constitutional right to present a defense requires the trial court to apply evidentiary rules in light of that defense. *See Jones*, 168 Wn.2d at 722-24. In *Jones*, the trial court excluded a defendant's evidence under the so-called rape shield statute, RCW 9A.44.020(2). *Jones*, 168 Wn.2d at 721-22. The court held that even if the rape shield statute applied, it could not be used to exclude the defendant's evidence that had extremely high probative value without violating the right to present a defense. *Id.* at 723-24. The court emphasized that if evidence has high probative value, no state interests can be compelling enough to preclude its introduction. *Id.*

In *State v. Duarte Vela*, the State relied on ER 403 to support the trial court's exclusion of certain evidence relevant to the defendant's self-defense claim. 200 Wn. App. 306, 320, 402 P.3d 281 (2017). Division Three of this court stated that "the ER 403 balancing of probative value versus unfair prejudice is weighed differently when the defense seeks to admit evidence that is central to its defense." *Id.* The court emphasized that the right to present a defense requires admitting highly probative evidence, and that ER 403 cannot be used to exclude crucial evidence relevant to a defendant's valid defense. *Id.* at 320-21.

In *State v. Cayetano-Jaimes*, the trial court denied the defendant's request to present the testimony of a crucial defense witness by telephone. 190 Wn. App. 286, 294, 359 P.3d 919 (2015). Division One noted that a trial court has broad authority to control trial proceedings

under ER 611(a). *Id.* at 296. However, the court emphasized that the witness's testimony was of extremely high probative value because if believed, it would have provided a complete defense to the charged crime. *Id.* at 300. As a result, the court concluded that excluding the witness's testimony prevented the defendant from presenting a complete defense and deprived him of a fair trial. *Id.* at 304.

Guaranteeing a defendant's constitutional right to present a defense may require a trial court to admit expert testimony that has questionable relevance or reliability. The court in *Duarte Vela* addressed this issue. The court stated that because cross-examination will reveal weak or false evidence, the trial court should admit probative evidence even if it is suspect and allow it to be tested by cross-examination. *Duarte Vela*, 200 Wn. App. at 321. The court concluded, "When it comes to ensuring a defendant's Sixth Amendment right to present a defense, it is best to admit relevant evidence and trust the State's cross-examination to ferret out falsities." *Id.* at 323-24.

2.    Standard of Review

Arndt advocates for a de novo standard of review for a claimed violation of the right to present a defense. But the standard of review is complicated. The Supreme Court in *Jones* stated that a claim that the trial court has violated the defendant's right to present a defense is reviewed de novo. 168 Wn.2d at 719. Similarly, the Supreme Court more recently stated that whether a trial court violated the constitutional right to present a defense by excluding relevant defense evidence is determined "as a matter of law." *State v. Clark*, 187 Wn.2d 641, 648-49, 389 P.3d 462 (2017).

On the other hand, in *Clark* the court stated, in the sentence preceding its reference to a "matter of law," that the trial court's evidentiary rulings are reviewed for abuse of discretion. *Id.* at 648. And the Supreme Court in cases involving one aspect of the right to present a defense – the scope of cross-examination – has held that the trial court's ruling is reviewed for abuse of discretion. *State v. Lee*, 188 Wn.2d 473, 486, 396 P.3d 316 (2017); *State v. Arredondo*, 188 Wn.2d 244, 265, 394 P.3d 348 (2017). Like *Clark*, some courts state both standards of review in the same paragraph. *Jefferson*, 199 Wn. App. at 800; *Cayetano-Jaimes*, 190 Wn. App. at 295.

Until the Supreme Court provides more clarification, this court should apply an "enhanced" abuse of discretion standard that recognizes the trial court's obligation to consider the right to present a defense in its analysis. For instance, in *Duarte Vela*, the court applied the abuse of discretion standard of review. 200 Wn. App. at 317. However, the court stated that when a trial court exercises its discretion to exclude relevant evidence, "the more the exclusion of that evidence prejudices an articulated defense theory, the more likely we will find that the trial court abused its discretion." *Id.*[22] Similarly, after stating the abuse of discretion standard, the court in *Jefferson* stated that a trial court abuses its discretion by denying a criminal defendant's constitutional rights. 199 Wn. App. at 800.

---

[22] The court added the discussion of the abuse of discretion standard in an order amending its opinion. Order Denying Mot. for Recons. & Amending Op., *State v. Duarte Vela*, No. 33299-3-III, http://www.courts.wa.gov/opinions/pdf/332993_ord.pdf. Therefore, the language quoted does not appear in the advance sheet version of the opinion.

3.    Right to Present a Defense Analysis

Mann's testimony was highly probative and was crucial to Arndt's defense. Lynam's primary hypothesis was that Arndt had moved the beanbag chair next to the couch and ignited it. Mann was precluded from giving his opinion that a plastic bucket had been present next to the couch at the time of fire and had not completely melted, a fact that showed that a beanbag chair could not have burned without leaving a trace in that area. Mann was also precluded from giving his opinion that the absence of polystyrene residue in the area of the couch showed that a beanbag chair could not have been present in that area at the time of the fire. Therefore, the trial court's rulings prevented Arndt from presenting evidence that objective data did not support the State's claim that Arndt ignited a beanbag chair to start the fire.

Even if the trial court had legitimate concerns about the reliability of Mann's testimony, the court should have applied ER 702 in light of Arndt's constitutional right to present a defense. The State did not show that Mann's testimony would be so prejudicial as to disrupt the fairness of the fact-finding process at trial or that the State's interest in excluding the evidence outweighed Arndt's need for that evidence. *See Jones*, 168 Wn.2d at 720. And as the court noted in *Jones*, the State's interest could not be compelling enough to preclude Mann's testimony because it had such high probative value. *Id.*

The State questioned whether Mann's testimony was reliable because he did not conduct a complete origin and cause investigation and because he did pick and choose the aspects of Lynam's investigation that he wanted to test. But any such deficiencies go to the weight of Mann's testimony rather than admissibility. The trial court's proper course of action to protect

Arndt's constitutional rights was to admit the testimony and allow the State to test Mann's opinions on cross-examination.

I would hold that by precluding Arndt from presenting highly probative expert testimony, the trial court violated her constitutional right to present a defense to the very serious charges against her.

CONCLUSION

The trial court erred in excluding portions of Mann's expert testimony, which were highly probative and crucial to Arndt's defense. As a result, Arndt did not receive a fair trial. The majority incorrectly affirms the trial court. Accordingly, I dissent.

MAXA, A.C.J.