IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

LEWIS C. COLLEY and TALENA )
COLLEY, husband and wife, and the ) No. 68267-9-I
marital community thereof, )
)
) DIVISION ONE
Appellants, )
)
v. )
)
PEACEHEALTH, a not for profit )
Washington State corporation d/b/a )
ST. JOSEPH HOSPITAL and )
ST. JOSEPH MEDICAL GROUP, )
)
Respondent, ) UNPUBLISHED OPINION
)
JIAN Y. SUN, M.D. and JOHN DOE ) FILED: September 3, 2013
SUN, husband and wife and the marital )
community thereof; JANICE LUND and )
JOHN DOE LUND, husband and wife )
and the marital community therefor; )
K. HANBURY and JOHN DOE )
HANBURY, husband and wife and the )
marital community therefor; MELISSA )
DYKSTRA and JOHN DOE DYKSTRA, )
husband and wife, and the marital )
community thereof; NORTHWEST )
EMERGENCY PHYSICIANS, INC., a )
Washington State for profit corporation; )
RALPH WEICHE and JANE DOE )
WEICHE, husband and wife, and the )
marital community thereof; and JANE )
and JOHN DOES 1-10, )
)
Defendants. )
_____ )

BECKER, J. — This appeal arises from a jury's defense verdict in a medical negligence action against PeaceHealth St. Joseph Hospital in Bellingham. The hospital patient and his wife contend the trial court admitted evidence that was speculative, irrelevant, and unfairly prejudicial. Finding no basis for granting a new trial, we affirm.

## FACTS

The hospital patient is appellant Lewis Colley. In the spring of 2006, when he was around 45 years old, Colley began complaining of recurrent abdominal pain. On May 4, 2006, Colley's pain was severe. At around 7:45 p.m., he and his wife, Talena, went to the emergency room at the hospital. The emergency room physician suspected pancreatitis and prescribed morphine for pain relief.

Colley's pain did not abate despite repeated doses of morphine and one dose of dilaudid. Around 2:00 a.m. on May 5, he was admitted to the observation unit.

Several months earlier, in January 2006, Colley had been diagnosed with severe sleep apnea. Sleep apnea is a condition in which a patient stops breathing for periods of time while asleep. It was uncontested at trial that morphine tends to suppress respiration and that when patients with sleep apnea are given morphine, they need to be carefully monitored to ensure they are getting enough oxygen.

While Colley was at the hospital on May 4 and 5, Talena observed that he was having difficulty breathing. She testified that she told several different

2

hospital employees that Colley suffered from sleep apnea. The sleep apnea condition was noted in Colley's chart by attending nurse Dawn Hooker at 3:35 a.m. At some point thereafter, Talena made a quick trip home to pick up the breathing device Colley used while sleeping, called a CPAP (continuous positive airway pressure) machine.

Talena testified that she returned to the hospital around 5:40 a.m., found Colley not breathing, and alerted the nursing staff. A respiratory therapist and a physician, Dr. Jian Sun, were called. A breathing tube was fed into Colley's throat, and he was taken to the intensive care unit and hooked up to an oxygen supply.

One of Colley's witnesses testified at trial that blood oxygen saturation becomes "critical" when the percentage falls below 60 percent, while at 80 percent, it generally causes only shortness of breath. A defense expert testified that 80 percent could be "right on the precipice of" a severe deprivation of oxygen, depending on how frequently the apnea episodes were occurring. Colley's oxygen saturation level was documented in his medical chart as 97 percent at intake at 2:13 a.m. and 92 percent at 4:11 a.m. There was no further record of it until 5:45 a.m., soon after he was hooked up to an oxygen supply. At that point his blood oxygen saturation was noted to be "in the 80s." At 6:04 a.m., his oxygen level was 89.5 percent. At 7:10, his oxygen level had risen to 98.5 percent. There was no way to know what his saturation level had been between 4:11 a.m. and 5:45 a.m.

3

Five days later, Colley was discharged from the hospital. His abdominal pain had abated, but Talena observed changes in his personality and mental state that she attributed to the episode of respiratory failure. Talena testified that while Colley had been a jolly, happy, sociable, and capable man before the hospitalization, afterwards he became reclusive, fearful, and angry, he suffered from severe memory deficits, and he was generally unable to function normally without close supervision. She testified, "It's like I took my husband to the hospital and they sent me home with a stranger."

The Colleys sued the hospital in July 2008, alleging that Colley suffered permanent brain injury due to the hospital's negligence in dealing with the episode of respiratory failure. The case came to trial before a jury in November 2011. Trial lasted nine court days, spanned four weeks, and included testimony by 30 witnesses, most of whom were medical professionals.

In the plaintiff's case, Dr. Ted Judd, a neuropsychologist, testified that Colley had a severe short-term memory deficit of a kind routinely associated with deprivation of oxygen. Dr. Arthur Ginsberg, a neurologist, testified that Colley's short-term memory deficit was caused, more probably than not, by brain damage resulting from the loss of oxygen associated with his respiratory failure. He explained that an injury to the brain that causes a memory deficit is not visible by imaging such as a computed tomography (CT) scan or a magnetic resonance imaging (MRI). Dr. Steven Pantilat testified that the standard of care required continuous pulse oximetry for a patient such as Colley, where a sensor that clips

4

onto the finger sets off an alarm if the patient's oxygen level falls below a certain point. Dr. Ralph Weiche, the emergency room physician who discharged Colley to the observation unit and wrote the morphine order, testified that Nurse Hooker, Colley's attendant in the observation unit, misinterpreted the order and as a result gave Colley more morphine than he had intended.

The hospital responded with testimony that the doses of morphine Colley received were not excessive, that continuous pulse oximetry was not required to meet the standard of care, that nurses had monitored Colley adequately by making regular visits to his room throughout the night, and that the evidence did not show Colley's blood oxygen levels ever fell to dangerous levels capable of causing brain damage. The hospital brought out evidence that he had memory problems predating the incident in the hospital. The January 2006 report completed by Dr. Francisco Vega in connection with the diagnosis of sleep apnea stated that Colley "feels that his daytime fatigue has resulted in memory difficulties."

Colley suffered from several pre-existing conditions, including not only obstructive sleep apnea, but also shortness of breath, diabetes, high cholesterol, hyperglycemia, recurrent toe infections, chronic headaches, post traumatic stress disorder, obsessive compulsive disorder, anxiety, and depression. Expert witnesses for the hospital testified that memory loss was consistent with some of these other conditions. Colley took a number of prescription medications. Earlier in his life, he had been a heavy drinker. Ten years earlier, he had suffered a

5

traumatic brain injury in a motor vehicle accident. Two years earlier, he had stopped working and applied for disability benefits.

Colley asked the jury to award him some $7,000,000 in damages. The hospital suggested in argument that if the jury reached the issue of damages, an appropriate award would be in the range of $100,000. The jury found the hospital not negligent and did not reach causation or damages.

This appeal followed.

## CITATION TO UNPUBLISHED OPINIONS

As a preliminary matter, we address Colley's objection to the hospital's citation to two unpublished opinions of this court. The hospital attached the opinions and discussed them in the brief of respondent. Colley's criticism of this practice is well-founded. Citing an unpublished opinion is a violation of Washington court rules. "A party may not cite as an authority an unpublished opinion of the Court of Appeals." GR 14.1(a).

There are cogent arguments for permitting citation to unpublished opinions and many courts do. See Jessie Allen, *The Right to Cite: Why Fair and Accountable Courts Should Abandon No-Citation Rules* (Brennan Ctr. for Justice at N.Y. Univ. Sch. of Law, Judicial Independence Ser., 2005), *available at* http://www.brennancenter.org/sites/default/files/legacy/d/download_file_35429.pdf

But so long as Washington court rules forbid citation of this court's unpublished opinions, we will not look kindly upon the hospital's facile explanation that the opinions were cited as "illustrative" and "persuasive," not as

6

"authority." See Johnson v. Allstate Ins. Co., 126 Wn. App. 510, 519, 108 P.3d 1273 (2005). That rationale swallows the rule. If one party cites an unpublished opinion, then in fairness the other party must be allowed to explain why the opinion is neither illustrative nor persuasive, creating a controversy that the appellate court will find difficult to resolve without citing the unpublished opinion.

We recently explained, "If a party finds a helpful analysis in an unpublished opinion, the proper way to present it is to cite the authorities relied on in the unpublished opinion and show how they apply." State v. Nysta, 168 Wn. App. 30, 44, 275 P.3d 1162 (2012), review denied, 177 Wn.2d 1008 (2013). This suggestion, while admittedly a workaround, enables a party to confront the Court of Appeals with its previous decisions without violating GR 14.1(a).

## CERTIFICATE OF MERIT

On the merits, Colley contends that the trial court committed reversible error by denying three of his motions in limine. This court reviews a trial court's rulings on motions in limine for abuse of discretion. Gammon v. Clark Equip. Co., 38 Wn. App. 274, 286, 686 P.2d 1102 (1984), aff'd, 104 Wn.2d 613, 707 P.2d 685 (1985). If the trial court abuses its discretion, the error will not be reversible unless the appellant demonstrates prejudice. Portch v. Sommerville, 113 Wn. App. 807, 810, 55 P.3d 661 (2002), review denied, 149 Wn.2d 1018 (2003).

When Colley filed suit in 2008, medical negligence actions were subject to a statutory procedural requirement set forth in RCW 7.70.150. The statute was

7

intended as an obstacle to meritless actions. At the time of commencing a medical negligence action, the plaintiff had to file a "certificate of merit" as to each defendant. The certificate had to be signed by a "health care provider who meets the qualifications of an expert in the action." RCW 7.70.150(2). Each certificate was required to contain

> a statement that the person executing the certificate of merit believes, based on the information known at the time of executing the certificate of merit, that there is a reasonable probability that the defendant's conduct did not follow the accepted standard of care required to be exercised by the defendant.

RCW 7.70.150(3). Colley filed certificates of merit signed by Nurse Sarah Covington, a witness on the standard of care for nurses, and Dr. Pantilat. Nurse Covington's certificate tracked the language of the statute. She stated that she had "reviewed the information available to me at this time" and believed that several hospital employees she identified by name and "Jane and John Does 1-10" had committed malpractice, proximately causing injury to Colley.

When Colley's case went to trial in November 2011, the requirement to file a certificate of merit was no longer in effect. The Supreme Court struck it down in 2009 as an unconstitutional deprivation of due process and access to the courts. Putman v. Wenatchee Valley Med. Ctr., P.S., 166 Wn.2d 974, 979, 216 P.3d 374 (2009).

> Through the discovery process, plaintiffs uncover the evidence necessary to pursue their claims. Obtaining the evidence necessary to obtain a certificate of merit may not be possible prior to discovery, when health care workers can be interviewed and procedural manuals reviewed.

8

Putman, 166 Wn.2d at 979.

By the time of trial, after discovery had been conducted, Nurse Covington was expected to testify only that Nurse Hooker violated the standard of care. Nurse Hooker was not among the individuals named in Nurse Covington's certificate of merit.

Colley moved in limine to prevent the hospital from using the certificates of merit to show that Dr. Pantilat and Nurse Covington had changed their opinions. He argued that such use would be unfair in view of Putman. "Having been forced to file certificates by an unconstitutional statute, Plaintiffs should not further be punished by having their witnesses questioned about opinions given at a time when the evidence provided by discovery was not available." The trial court denied the motion, accepting the hospital's argument that a certificate of merit was relevant and admissible under Evidence Rule 613 as the "prior statement" of a witness. ER 613(a).

We agree with Colley that the motion in limine should have been granted. Putman demonstrates that the certificates of merit were unfairly and coercively extracted from Colley as the unconstitutional price of admission to the court. ER 403 is applicable. The minimal relevance to the credibility of the witnesses was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. To put the evidence in its proper context for the jury would require explaining the statute, the Putman decision, and the rules of discovery. Such explanations would inevitably be lengthy and distracting.

9

Whether the error is reversible, however, is another matter. Portch, 113 Wn. App. at 810. The only certificate the jury heard about was Nurse Covington's. On direct examination, Nurse Covington criticized Nurse Hooker for failing to ask for clarification of an ambiguous morphine order, administering more morphine than had been prescribed, checking Colley's oxygen saturation too infrequently, and failing to tell the attending physician about Colley's sleep apnea, which was significant information about a patient who was receiving morphine.

On cross-examination, defense counsel confronted Nurse Covington with her failure to identify Nurse Hooker in the certificate of merit.

> Q. Okay. Now, when you first, when you first were asked to review records in this case, you were given kind of a binder of records?
> A. Yes, sir.
> Q. And it was your understanding that that was the complete hospital record?
> A. Yes, sir.
> Q. And you reviewed all of those documents, correct?
> A. Yes, sir.
> Q. And then you, you signed a, a legal document that said your opinion; is that correct?
> A. Yes, sir.
> . . . .
> Q. In your review of the records, you certainly saw the name of Dawn Hooker, correct?
> A. Yes.
> Q. It wasn't some scribble that you couldn't read or anything like that, correct?
> A. Correct.
> . . . .
> Q. So when you signed this document that these individuals were acting below the standard of care, you did not include Dawn Hooker, correct?
> A. Correct.
> Q. And you did not edit this to say, wait a minute, Mr. Leemon,

let me include Dawn Hooker, correct?

A. Correct.

This was the scope of the questions to Nurse Covington about the certificate of merit.

Defense counsel also cross-examined Nurse Covington to elicit her agreement that in an observation unit, failing to use a continuous pulse oximetry device did not violate the standard of care; and that Colley's chart indicated that Nurse Hooker did not learn about his sleep apnea condition until 3:35 a.m., whereas the last dose of morphine had been given at 3:20 a.m. Counsel brought out that Nurse Covington had not worked in a critical care unit in a hospital setting since 1988 and had no experience working in a hospital observation unit or emergency room. In closing, the hospital made no mention of Nurse Covington, other than to argue in passing that her credentials and hospital experience were less impressive than those of the nurse who testified as an expert witness for the hospital.

Nurse Covington was a relatively peripheral witness. It was undisputed that Nurse Hooker misread the orders for morphine and gave Colley more than the prescribing physician intended. And the plaintiff's case did not depend on Nurse Covington's opinion to show that Colley's oxygen saturation level should have been monitored more continuously. This opinion was more authoritatively rendered by the physicians who testified on the standard of care. In the context of a nine-day trial, forcing Nurse Covington to admit that Nurse Hooker's name was not mentioned in the certificate of merit was a point too obscure to create

11

more than a pinprick of prejudice.

We conclude that the trial court erred by allowing the hospital to impeach Nurse Covington with the certificate of merit, but the error does not require reversal.

## DEFENSE WITNESSES ON CAUSATION

Colley moved in limine to exclude three experts who had been identified as defense witnesses on causation but who, according to Colley, had no opinions on causation. The court denied the motion. All three experts testified at trial.

On appeal, Colley argues that the three experts presented an "overwhelming cacophony" of irrelevant and speculative evidence, insinuating that he was brain damaged before he arrived at the hospital.

The hospital points out that each expert was offered as a witness on causation and the jury did not reach the issue of causation. This does not, however, necessarily mean that their testimony could not have been prejudicial. In a personal injury trial, it is not always possible to keep the issues of breach and causation compartmentalized. Even if the witnesses were examined only about causation, their opinions could have tainted the jury's consideration of the negligence question if they were irrelevant and unfairly put Colley in a bad light. Colley is entitled to consideration of his arguments about these witnesses.

Dr. Pascualy

Dr. Ralph Pascualy, M.D., a psychiatrist and expert in sleep apnea and sleep medicine, identified several factors besides oxygen deprivation that could have caused Colley to experience memory loss, including his severe sleep apnea, irregular use of the CPAP machine, diabetes, and past history of heavy drinking. He testified that because there was no evidence of Colley's oxygen saturation levels between 4:11 a.m. and 5:45 a.m., it was not possible to say whether the hospital event was severe enough to cause memory problems.

Colley argues that Dr. Pascualy's testimony should not have been admitted unless he was prepared to say either that respiratory failure was not the cause of Colley's injury or that something else was the cause.

It is the plaintiff's burden in a medical negligence action to prove the statutory elements, including breach and causation. RCW 7.70.040; Berger v. Sonneland, 144 Wn.2d 91, 111, 26 P.3d 257 (2001). Witnesses who offer an opinion to prove medical causation must speak in terms of probability, not mere possibility. Miller v. Staton, 58 Wn.2d 879, 885-86, 365 P.2d 333 (1961). The defendant does not have the burden to prove causation or lack of causation. Nor is the defendant obligated to agree or assume that the plaintiff is injured.

Beginning with the premise that there was no other explanation for Colley's sudden loss of short-term memory, expert witnesses in the plaintiff's case deduced that the oxygen in his blood must have fallen to a critically low level during the hour and 30-minute period when it was not recorded. Dr.

13

Pascualy's testimony attacked the premise. He said there could be other explanations for memory loss and it was not possible to infer with certainty that Colley experienced serious oxygen deprivation while at the hospital. Dr. Pascualy's experience was adequate foundation for his opinion.

Colley cites Washington Irrigation & Development Company v. Sherman, 106 Wn.2d 685, 724 P.2d 997 (1986). The case involved a claim of lower back pain caused by industrial injury. The court held it was error for the opposing party to insinuate that two later auto collisions were a superseding cause of the lower back pain without proof that the collisions actually did aggravate the injury. This is not a similar case. Dr. Pascualy was not trying to establish a superseding cause. His testimony was offered to show that Colley lacked proof of causation. His testimony was properly admitted.

### Dr. Stimac

In March 2006 Colley complained to his primary care provider of increasingly severe headaches. His provider referred him for a CT scan of his brain. In June 2006, the hospital performed an MRI test of Colley's brain when he complained of continued headaches as well as memory and sensory problems. These two examinations provided images of Colley's brain just before and just after the incident at the hospital. The results of the two examinations were discussed during the plaintiff's case by Dr. Ginsberg, who testified that one can have an injury to the brain that causes short-term memory loss, yet is not visible by imaging.

14

The hospital presented Dr. Gary Stimac, a neuroradiologist, to interpret and compare the images. Dr. Stimac testified that as of March 2006, Colley's brain already showed signs of damage—a generally "shrunken" appearance and "a diffuse loss of brain substance"—and it did not show any visible differences by June 2006. Dr. Stimac agreed it was entirely possible that Colley had suffered a mental impairment such as memory loss in May 2006 which would not show up on an MRI.

Colley contends Dr. Stimac's testimony was irrelevant because he had no opinion about what was causing the memory loss. Again, to be relevant, it was not necessary for Dr. Stimac to render an affirmative opinion as to the cause of Colley's alleged impairment. It was relevant for the jury to hear that the visible condition of Colley's brain was consistent with his previous medical issues and there was no image consistent with an acute insult to the brain such as extended oxygen deprivation.

### Dr. Ellsworth

Just before Colley was admitted to the observation unit at 2:00 a.m., he was given 8 milligrams of morphine to relieve his abdominal pain. Dr. Weiche, the emergency room physician, left orders that Colley could receive up to 8 more milligrams in the next four hours depending on his level of pain. Over the next hour and a half, Nurse Hooker, who misunderstood the order, administered 10 milligrams. Colley claimed that the misreading of the orders was one of the negligent acts that ultimately led to his respiratory failure.

15

Dr. Allan Ellsworth, a pharmacology expert called by the hospital, testified that 10 milligrams of morphine was within the range of reasonable therapeutic doses under the circumstances. He explained the rate at which morphine typically cycles through the body and compared this information to when Colley received his morphine doses and when he began to suffer breathing troubles. Defense counsel referred to Dr. Ellsworth's testimony in closing, arguing that the administration of ten milligrams was not negligent because "we had plenty of evidence that ten milligrams is not outside the normal range."

Colley contends he was not specifically claiming he had suffered an overdose of morphine and therefore the discussion about the range of acceptable morphine dosage was irrelevant. His argument is unconvincing. There would be no point to his allegation that Nurse Hooker misread the dosage instructions unless her carelessness resulted in an overdose.

Colley suggests that Dr. Ellsworth's opinions were flawed because he based them on content gleaned from a web site, he used data derived from patients who had received morphine in a different manner than Colley, and he used data derived from adults who were not obese, even though narcotics tend to cycle more slowly through a heavier body such as Colley's. Expert testimony need not be flawless to be admissible. These objections go to the weight of Dr. Ellsworth's testimony, not its admissibility.

Contrary to Colley's argument, allowing the three experts to testify was not contrary to Stedman v. Cooper, 172 Wn. App. 9, 292 P.3d 764 (2012). In

16

Stedman, the plaintiff alleged that she had sustained injuries in a car crash. A biomechanical engineer offered the opinion that the car crash could not have caused the injuries, even while disclaiming any intention of offering an opinion about whether the plaintiff's injuries were caused by the crash. Stedman, 172 Wn. App. at 20. We reasoned that a trial court could find that such testimony was "more likely to be misleading than helpful" and held the trial court did not abuse its discretion by excluding it. Stedman, 172 Wn. App. at 20-21. Here, the experts stayed within their expertise and did not speculate. The trial court did not abuse its discretion by allowing them to testify.

Colley presented expert testimony tending to prove that the hospital's negligence caused him grave harm. The expert witnesses for the hospital offered competing opinions tending to deprive Colley's proof of the persuasive power necessary to cross the 50 percent threshold. Colley cross-examined each defense expert to show the jury how poorly formed and unreliable he believed their opinions were. The record does not sustain Colley's argument that the testimony the witnesses were allowed to give was improper.

## PREVIOUS ALCOHOL ABUSE

Colley's medical records included examinations in 2004 and 2005, during which he admitted that until about 2002, he "had been drinking beer like a fish." Colley's wife, who first met him in 2002, testified on direct examination that Colley admitted drinking heavily in his past, but she had never known him to have a drinking problem, and he took his last drink on the night of their wedding.

17

Colley moved in limine under Evidence Rules 403 and 404(b) to exclude reference to his history of alcohol consumption. The court denied the motion.

At trial, witnesses for the hospital referred to Colley's past history of alcohol abuse in connection with memory loss and tolerance to morphine. Dr. Stimac said it helped to explain why Colley's brain showed a "shrunken" appearance both before and after the incident. Dr. Kristoffer Rhoads testified that alcohol can affect the frontal lobes of the brain and affect memory, attention, and concentration, but that after six months of sobriety, any further damage would be "negligible." Dr. Pascualy referred to Colley's admission during examinations that he used to "drink like a fish." The hospital inquired about Colley's former alcoholism on cross-examination of Colley's witness Dr. Ted Judd, who testified that former alcohol abuse can cause a mild impairment to attention and concentration. In closing argument, Colley's counsel attempted to minimize the effect of the hospital's multiple references to Colley's former alcohol use. He said they were an attempt to suggest "that these people weren't worth very much to begin with and how much harm could we really cause them."

Evidence of past alcohol abuse is potentially quite prejudicial, as this court recognized in Kramer v. JI Case Manufacturing Company, 62 Wn. App. 544, 815 P.2d 798 (1991). In Kramer, the plaintiff brought a product liability action against the manufacturer of a backhoe that slid into him on a jobsite. The trial court permitted the defendant to elicit evidence of alcohol abuse to support an argument that substance abuse reduces life expectancy and diminishes

18

employment prospects. Several witnesses testified that the plaintiff had a serious, current addiction to alcohol and that he regularly used marijuana. Kramer, 62 Wn. App. at 557. This court held such evidence should have been excluded because there was no proof that substance abuse had actually affected the plaintiff's life expectancy or his employment prospects.

Colley contends that similarly here, it was error to admit the evidence without proof of its relevance to some larger point. But here, the record does demonstrate the relevance of Colley's history of alcohol use. And unlike in Kramer, the hospital did not depict Colley as having a current alcohol problem. The undisputed testimony was that he was currently a regular church goer and fully abstinent. While prejudice always clings to alcohol abuse to some degree, the trial court could reasonably conclude that the evidence of Colley's heavy consumption of alcohol in the past had probative value that outweighed the prejudice.

In summary, Colley has failed to show that the trial court's denial of his motions in limine deprived him of a fair trial.

Affirmed.

No. 68267-9-I/20

WE CONCUR:

_Becker, J._

_Spearman, A.C.J._

_Appelwick, J._