IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| JAMES NEEDHAM, Individually, | ) | |
| | ) | No. 78574-5-I |
| Appellant, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| SHERYL DREYER, Individually, and | ) | PUBLISHED OPINION |
| her marital community, and DAVITA | ) | |
| EVERETT PHYSICIANS, INC. P.S. | ) | |
| d/b/a The Everett Clinic, | ) | |
| | ) | |
| Respondents. | ) | FILED: December 23, 2019 |
| | ) | |

SMITH, J. — On December 28, 2012, James Needham visited his primary care physician, Dr. Sheryl Dreyer, at The Everett Clinic (Clinic). Needham presented to the medical assistant with, among other things, difficulty breathing and gastrointestinal issues. Dr. Dreyer did not address his breathing symptoms, but treated Needham for his "active problems," including HIV and diarrhea. On January 1, 2013, Needham was found unconscious in a friend's cabin in Concrete, Washington. Needham suffered frostbite, which resulted in the amputation of both of his legs. Needham sued Dr. Dreyer and the Clinic alleging medical negligence as the cause of his injuries. Needham appeals the defense verdict, arguing that the trial court erred when it provided the exercise of judgment instruction, which directs the jury to find that a physician is not liable for medical negligence if the physician used their medical judgment to choose one of

multiple treatments or diagnoses. Needham further argues that the trial court erred by admitting expert opinion evidence regarding Needham's alcohol use on the day of his collapse.

Because Dr. Dreyer did not select one of two or more alternative courses of treatment and did not arrive at a judgment to follow a particular course of treatment or make a particular diagnosis with regard to Needham's breathing symptoms, the trial court erred by giving the exercise of judgment instruction. The trial court further erred by admitting evidence of Needham's alcohol use on the day of his collapse because the probative value of that evidence was substantially outweighed by the risk of unfair prejudice. Finally, because these errors were not harmless, we reverse the jury verdict and remand for a new trial.

## FACTS

Needham is HIV positive, and Dr. Dreyer had been his primary care physician since 2011. After their first appointment, Dr. Dreyer ordered lab testing and discovered that Needham's "T cells [were] at 92," which put him at risk for "pneumocystis" pneumonia (PCP). PCP is a type of pneumonia to which individuals with HIV are particularly susceptible. After receiving these lab results, Dr. Dreyer sent Needham a letter explaining that he should begin taking a prophylactic to prevent PCP.

On September 28, 2012, Needham's roommate, Jackie Black, called the Clinic to express concerns regarding Needham's health; Needham was coughing and exhibiting loss of balance, drowsiness, and disorientation. Dr. Dreyer recommended that Black take Needham to an emergency room (ER) for an

evaluation. Two days later, United General Hospital admitted Needham and treated him for pneumonia in the lower right lobe of his lung. The treating physician took a chest X-ray, which indicated that Needham suffered from a possible collapsed lung.

Two weeks after United General discharged him, Needham visited Dr. Dreyer for, among other things, pain in his ribs and shoulder, which worsened when he breathed. Despite these symptoms, Dr. Dreyer believed Needham's pneumonia was improving but that he "may need a follow up chest CT" (computed tomography) scan. She recommended a follow-up in one month.

On October 23, 2012, Black once again called the Clinic, reporting that Needham's health had deteriorated. The Clinic advised Black to take Needham to the hospital and to notify the ER of the potential for PCP. The ER at Providence Health Center admitted Needham for *Clostridium difficile* (C. difficile) infection. The treating physician, Dr. Donald Berry, took a CT scan of Needham's abdomen. Needham's experts later testified that the CT scan indicated "[t]here was still something going on in th[e] lower lobe" of his right lung. Conversely, Dr. Dreyer's expert, Dr. Robert Harrington, testified that the CT scan did not show evidence that Needham had pneumonia at that time. Dr. Berry also took a chest X-ray, which he—and later, Dr. Dreyer—determined showed normal lung health. After treatment for C. difficile, the hospital discharged Needham.

On November 14, 2012, Needham visited the Clinic for a follow-up. He expressed concerns of back pain. The records from his visit indicate that he

3

reported he was "slowly feeling better" after his pneumonia. Dr. Dreyer performed a chest exam and found that Needham's "chest [was] clear [with] no wheezes or rales." Based on the results of Needham's ER X-ray from October 23, Dr. Dreyer chose to forego additional testing for Needham's pneumonia because she believed "the pneumonia wasn't there anymore." As a result, Dr. Dreyer did not recommend any follow-up on Needham's pneumonia in his intoxicated treatment plan.

On November 30, Black contacted the Clinic reporting that Needham had been experiencing diarrhea for six weeks; the Clinic advised that he needed a C. difficile test. Additionally, Dr. Dreyer entered a referral for a gastroenterologist. On December 5, 2012, the Clinic called Needham to inquire when he would take laboratory tests for C. difficile. Needham explained that his dog was dying and that "making her comfortable [was] his only concern."

A week later, Needham called the Clinic to re-order an X-ray, which his previous doctor had ordered over the summer but that Needham had been unable to complete at the time. In response to Needham's call, Dr. Dreyer requested that Needham also get his "usual lab orders" completed. Needham did not get his lab orders completed until he visited the Clinic on December 28, 2012. At that appointment, Needham mentioned difficulty breathing to the medical assistant as one of his reasons for visiting. The medical assistant noted this in Needham's record. Needham claims his vital signs were abnormal; his pulse was 106, his blood pressure was 80/50, and his pulse oximeter reading was at 93 percent—below a normal range of 95 to 100 percent.

Dr. Dreyer did not discuss Needham's breathing problem with him, but later testified that she performed an "observational" exam, which Dr. Dreyer alleges involves listening to a patient, observing whether the patient is coughing, is short of breath, or has difficulty speaking. The medical record from Needham's visit indicates that Dr. Dreyer treated Needham for his "active problems": HIV, diarrhea, back pain, and his "social situation," which included the recent passing of his housemate and his dog. Needham testified that Dr. Dreyer discredited his hypothesis that he had cracked his right rib or that he suffered from a hernia, and instead, Needham testified that she said it was "just depression." Needham also testified that no one discussed his abnormal vital signs with him and that Dr. Dreyer did not complete a chest exam.

Later that morning after Needham had left the Clinic, at 10:51 a.m., the laboratory paged the Clinic's on-call doctor, Dr. Eileen de la Cruze, about the results of Needham's same-day lab tests. The laboratory explained that Needham's white blood cell count showed a potentially serious infection. Dr. de la Cruze tried but could not reach Needham on his cell phone, and she documented in the Clinic's records that Needham had not set up his voicemail. At 9:07 p.m., Dr. de la Cruze called Needham's previous home number and then retried Needham's cell phone. At that time, she noted in the record that she left a voicemail. A few days later, on December 31, 2012, Registered Nurse (RN) Colleen Burt called Needham's counselor to ask if she had a new contact number for Needham. The counselor was out of the office, and RN Burt left a voicemail message.

The next day, January 1, 2013, Needham's friends found Needham unconscious at his friend's cabin in Concrete, Washington, and first responders transported him to Sedro-Wooley Hospital. The treating physician determined that Needham suffered from pneumonia, pleural effusion, and frostbite. His legs were later amputated as a result of the frostbite.

Needham sued Dr. Dreyer and the Clinic for medical negligence. At trial, Needham testified that following his return from the Clinic on December 28, he spent the next two days trying to clean up his friend's cabin in Concrete. Needham recalled that it was hard to breathe. Needham testified that on December 31, he drank about three shots of alcohol. He testified that while cleaning, he looked outside and saw his deceased friend's cat, which had been missing for two days. Needham recalled that when he tried to grab the cat, he saw "like, a big white flash, and . . . [t]hat's all [he] remember[ed]" until he woke up in Sedro-Wooley Hospital.

The case was tried to a jury, and the trial court—over Needham's objection—gave the exercise of judgment instruction. The instruction, modeled after 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 105.08 (6th ed. 2012) (WPI), states:

> A health care provider is not liable for selecting one of two or more alternative courses of treatment, if, in arriving at the judgment to follow the particular course of treatment or make a particular diagnosis, the health care provider exercised reasonable care and skill within the standard of care the health care provider was obliged to follow.

The trial court also denied Needham's motion in limine to exclude defense expert opinions that alcohol use on the day of the accident could have caused Needham's collapse. Needham had argued it was speculative and irrelevant. The trial court concluded that the evidence was relevant and probative and that the defense experts "don't have to attack based on a probability of a reasonable degree of medical certainty . . . if they're just attacking and not offering an alternative causation." Thus, at trial, Dr. Dreyer and the Clinic introduced testimony from Dr. Benjamin Starnes and Dr. Peter Shalit regarding how alcohol could have caused Needham's collapse.

Before submitting the case to the jury, Needham renewed his earlier motion in limine to exclude testimony of alcohol use on the day of his collapse. The jury returned a verdict in favor of Dr. Dreyer and the Clinic. Needham appeals.

## DISCUSSION

### Exercise of Judgment Instruction

Needham argues that the trial court erred by giving the exercise of judgment instruction to the jury. Because the instruction is appropriate only when there is evidence that a physician makes a choice between alternative treatments or diagnoses and because Dr. Dreyer and the Clinic presented no such evidence, we agree.

We review a trial court's decision to provide a jury instruction for abuse of discretion. Fergen v. Sestero, 182 Wn.2d 794, 802, 346 P.3d 708 (2015). The facts of a particular case govern the propriety of a jury instruction. Fergen, 182

Wn.2d at 803. Jury instructions are generally sufficient if they: (1) "are supported by the evidence[, (2)] allow each party to argue its theory of the case," and (3) properly inform the trier of fact of the applicable law when all instructions are read together. Fergen, 182 Wn.2d at 803.

Our Supreme Court recently discussed the propriety of the exercise of judgment instruction in Fergen. There, the Court consolidated appeals from two trials in which the trial court gave the exercise of judgment instruction, and the jury returned a defense verdict. In the first case, Fergen, Paul Fergen presented to the physician with a lump on his ankle. Fergen, 182 Wn.2d at 799. In diagnosing the lump, Dr. Sestero performed a physical examination of the lump and took an X-ray of Fergen's ankle. Fergen, 182 Wn.2d at 799. Dr. Sestero diagnosed the lump as a benign cyst, "referred Fergen to an orthopedic specialist, and instructed him to follow up with his office as necessary." Fergen, 182 Wn.2d at 799. In so doing, Dr. Sestero chose to forgo an ultrasound on Fergen's ankle, which may have found the rare form of cancer that began in Fergen's ankle and resulted in his death. Fergen, 182 Wn.2d at 799-800.

In the second case, Appukuttan v. Overlake Medical Center, Anil Appukuttan injured his leg during a soccer game. Fergen, 182 Wn.2d at 801. He visited Overlake Medical Center's emergency department five times due to "persistent and worsening pain and increasing firmness in his left leg." Fergen, 182 Wn.2d at 801. Multiple physicians performed physical examinations of his leg, but no physician "measured the pressure in his leg to rule out compartment syndrome." Fergen, 182 Wn.2d at 801. Instead, "each [physician] believed their

8

physical examinations indicated other diagnoses." Fergen, 182 Wn.2d at 801. Appukuttan "suffered permanent foot drop injury as a result of the failure to diagnose and treat his compartment syndrome." Fergen, 182 Wn.2d at 801.

Both Fergen and Appukuttan argued that the exercise of judgment instruction was improper because the treating physicians did not make a choice that required them to exercise their medical judgment. Fergen, 182 Wn.2d at 806. Our Supreme Court concluded that the use of the instruction—previously known as the error in judgment instruction—was supported by Washington law and proper in both cases. Fergen, 182 Wn.2d at 812. With regard to Fergen, the court explained that Dr. Sestero "had a choice between referring Fergen to a specialist or not [,] . . . ordering an X ray or not[, and] ordering follow up testing or not." Fergen, 182 Wn.2d at 808. In Appukuttan, the court reasoned that the physicians decided that the pressure test "was unnecessary because their physical examination did not indicate that compartment syndrome was the diagnosis." Fergen, 182 Wn.2d at 809.

In reaching its holding, the court provided guidance as to when the exercise of judgment instruction is proper:

> In Washington, an exercise of judgment instruction is justified when (1) there is evidence that the physician exercised reasonable care and skill consistent with the applicable standard of care in formulating [their] judgment and (2) there is evidence that the physician made a choice among multiple alternative diagnoses (or courses of treatment).

Fergen, 182 Wn.2d at 806. Specifically, a court should give the instruction only when the physician presents sufficient evidence that they made a choice

between two or more alternative, "reasonable [and] medically acceptable" treatment plans or diagnoses. Fergen, 182 Wn.2d at 808. The court should not give the instruction "simply if a physician is practicing medicine at the time." Fergen, 182 Wn.2d at 808. The Fergen Court also recognized an exception to the instruction's use: A court should not give the exercise of judgment instruction in cases focusing on the inadequate skills of the physician. Fergen, 182 Wn.2d at 808.

Here, Needham claims that the trial court erred in giving the exercise of judgment instruction for three reasons. First, Needham maintains that the instruction should be abolished. Second, Needham contends that the instruction was improper because this case revolves around Dr. Dreyer's inadequate skills. And third, Needham asserts that the instruction was improper because Dr. Dreyer did not make a choice between medical treatments or diagnoses.

As to Needham's first assertion, our Supreme Court's decision to uphold the use of the exercise of judgment instruction in Fergen is *stare decisis* and binds this court. Thus, we may not entertain Needham's plea to disregard Fergen.

And as to Needham's second assertion, this case is not based on Dr. Dreyer's inadequate skills because Needham's claim rests on the determination that Dr. Dreyer was negligent in failing to diagnose or treat Needham. His claim does not rest on a determination that Dr. Dreyer lacked adequate skills to such a point that she was *incapable* of properly or effectively treat or diagnose Needham. Specifically, Needham argued that Dr. Dreyer did

not meet the standard of care in treating—or failing to treat—his pneumonia or C. difficile. Thus, this case does not fall within the inadequate skills exception to the exercise of judgment instruction under Fergen.

Therefore, the only remaining question before us is whether the instruction was improper because Dr. Dreyer did not make a choice between alternatives in order to treat or diagnose Needham's symptoms. Needham contends that "[f]ailing to follow up, failing to appreciate abnormal vital signs and failing to pay attention to a patient's complaints are not choices." For the reasons that follow, we agree and conclude that the use of the instruction was improper.

The trial court should use caution in providing the exercise of judgment instruction. Watson v. Hockett, 107 Wn.2d 158, 165, 727 P.2d 669 (1986). And again, the instruction is proper only when there is evidence that the physician made a choice among multiple alternative diagnoses or courses of treatment. Fergen, 182 Wn.2d at 806. But Dr. Dreyer presented no evidence that she chose between diagnoses or treatments. According to Needham's testimony and the medical record from his visit to the Clinic on December 28, 2012, Dr. Dreyer did not discuss Needham's breathing problem with him, and Dr. Dreyer testified that she did not perform a chest examination during the visit. Dr. Dreyer testified that she did not do so because Needham did not tell her he was having breathing problems. Specifically, the medical record indicates that the examination and treatment plan only addressed HIV, diarrhea, back pain, and Needham's mental health. Dr. Dreyer, however, testified that her recorded notes that Needham was "[i]n no apparent distress" and that "[h]is affect is normal" were the result of an

11

observation exam where she would determine whether Needham was having difficulty speaking or was short of breath. Furthermore, Dr. Dreyer did not recall discussing or reviewing Needham's abnormal vital signs with him. Nonetheless, she testified that she routinely reviews her patient's vital signs during examinations. In short, the record reveals that Dr. Dreyer did not address Needham's breathing symptoms at all, and it follows that she did not exercise her medical judgment to address Needham's symptoms.

Dicta within Housel v. James, 141 Wn. App. 748, 172 P.3d 712 (2007), illustrative of Dr. Dreyer's failure to make a choice. In Housel, Housel presented to Dr. James with a hernia, and Dr. James chose to repair the hernia through surgery. 141 Wn. App. at 752. The court noted that Dr. James had three options to treat Housel's hernia: "additional testing, *watchful waiting*, or surgical repair." Housel, 141 Wn. App at 760 (emphasis added). Because Dr. James chose between competing treatments, the court upheld the use of the exercise of judgment instruction. Housel, 141 Wn. App at 760. Here, had Dr. Dreyer chosen watchful waiting as treatment for Needham's breathing problems, for instance, she likely would have told Needham to monitor his symptoms and would have indicated in the medical record that monitoring was a part of the treatment plan. Indeed, in prior medical records, for example, Dr. Dreyer noted that Needham's "patient instructions" were "watchful monitoring" regarding his nose bleeds. Here, the medical records contain no such instruction and do not discuss breathing problems, thus indicating that Dr. Dreyer did not diagnose or choose between treatments for Needham's symptoms.

Dr. Dreyer and the Clinic argue that Dr. Dreyer presented evidence that she had the following choices: (1) relying on images from Needham's earlier hospitalizations or ordering a new X-ray or CT scan; (2) asking Needham about his statement to the medical assistant or performing a new inquiry and accepting Needham's answer; (3) "performing an additional chest exam or not;" (4) "re-testing his vital signs or not;" and (5) "relying on his clinical presentation or ordering additional testing to rule out pneumonia." But evidence that a physician *had* a choice is insufficient under Fergen, which requires the physician to present evidence that she *made* a choice.

To that end, the record contains no evidence that Dr. Dreyer *made* any of the choices that she claims she *had*. Specifically, Dr. Dreyer presented no evidence that she even discussed Needham's *present* breathing difficulties with him. Rather, the record indicates that Dr. Dreyer simply did not acknowledge Needham's reported chest symptoms despite being able to learn of them by reviewing his medical chart. It does not show that she reached the stage of medical treatment where she was exercising her judgment to choose between diagnoses and treatments. Choices may exist in every medical situation, but an active choice must be made in order to receive the exercise of benefit instruction. In short, we are not persuaded by Dr. Dreyer and the Clinic's assertion that the exercise of judgment instruction was proper simply because Dr. Dreyer may have *had* a choice when there is no evidence that she *made* a choice.

Dr. Dreyer and the Clinic next contend that she does not need to present evidence that she made a conscious choice. Dr. Dreyer and the Clinic rely on

13

language from Fergen stating that, to receive the exercise of judgment instruction, "evidence of consciously ruling out *other* diagnoses is not required." See Fergen, 182 Wn.2d at 799 (emphasis added). In Fergen, the physicians chose one diagnoses over another after completing examinations and tests, but did not perform additional testing to rule out other diagnoses. See Fergen, 182 Wn.2d at 808-09. But in contrast, Dr. Dreyer presented no evidence that she performed a physical examination and came to a diagnosis regarding Needham's difficulty breathing. Indeed, there was no evidence that Dr. Dreyer addressed Needham's potentially significant vital sign abnormalities or his statement to the medical assistant that he had difficulty breathing. Dr. Dreyer did not present evidence that she diagnosed Needham, and thus, she could not have ruled out another diagnosis. The record does not indicate that Dr. Dreyer diagnosed, treated, or acknowledged Needham's symptoms. Therefore, the language in Fergen regarding consciously ruling out diagnoses does not support Dr. Dreyer's position that the instruction was appropriate.

Because there was no evidence presented that she used her medical judgment to choose between alternative treatments or diagnoses of Needham's breathing problems, the trial court abused its discretion by giving the exercise of judgment instruction.

As a final matter, Dr. Dreyer and the Clinic contend that the trial court properly provided the exercise of judgment instruction with regard to Dr. de la Cruze. But Needham's complaint presented claims based on Dr. Dreyer's negligent acts—and the Clinic's vicarious liability therefrom. He alleged no

claims premised on Dr. de la Cruz's actions, and on appeal, he makes no arguments regarding Dr. de la Cruze. Therefore, the issue is not before us on appeal.

*Testimony on Alcohol Use*

Needham claims that the trial court erred by admitting the testimony form Dr. Dreyer's experts regarding how alcohol could have caused Needham's collapse. Specifically, Needham asserts that Colley v. Peacehealth, 177 Wn. App. 717, 312 P.3d 989 (2013)—which the trial court relied on to admit the evidence—does not control and the testimony was irrelevant and highly prejudicial. We agree and conclude that the record does not support the experts' testimonies and that the evidence is unduly prejudicial.

We review decisions to admit evidence for abuse of discretion. State v. Demery, 144 Wn.2d 753, 758, 30 P.3d 1278 (2001). "All relevant evidence is admissible. . . . Evidence which is not relevant is not admissible." ER 402. "Under ER 401, 'relevant evidence' is evidence that tends to make the existence of a material fact more or less probable, and, in a normal adjudication of criminal or civil liability, expert opinion does not satisfy this standard unless it is expressed to a reasonable degree of probability." State v. Schierman, 192 Wn.2d 577, 682-83, 438 P.3d 1063 (2018). Additionally, relevant evidence may be inadmissible "if its probative value is substantially outweighed by the danger of unfair prejudice." ER 403. To this end, there is "broad discretion afforded [to] a trial court in balancing the prejudicial impact of evidence against its probative

value." Kramer v. J.I. Case Mfg. Co., 62 Wn. App. 544, 559, 815 P.2d 798 (1991).

Here, the trial court relied on Colley to admit expert testimony regarding how Needham's alcohol consumption on December 31 could have caused his collapse. In Colley, Lewis Colley had been diagnosed with sleep apnea and diabetes, and the record contained evidence of a history of heavy drinking. Colley, 177 Wn. App. at 720, 722. Colley presented to Peacehealth St. Joseph Hospital with severe abdominal pain. Colley, 177 Wn. App. at 719. After returning to the hospital the morning after Colley was admitted, Colley's wife discovered that Colley was not breathing. Colley, 177 Wn. App. at 720. Colley alleged that while he was unconscious he suffered oxygen deprivation, which resulted in personality and mental changes including anger, fear, and severe memory deficits. Colley, 177 Wn. App. at 720-21. Colley brought a medical negligence claim against Peacehealth. Colley, 177 Wn. App. at 720.

The trial court admitted evidence that Colley had memory problems predating the incident at the hospital and that Colley's *history* of heavy alcohol drinking, a prior traumatic brain injury, or his other documented pre-existing conditions could have caused Colley's memory loss. Colley, 177 Wn. App. at 721-22. Specifically, Peacehealth's expert, Dr. Pascualy, testified that it was not possible to infer with certainty that Colley experienced serious oxygen deprivation causing his memory loss during his hospital stay. Colley, 177 Wn. App. at 728. On appeal from a defense verdict, Colley argued that the testimony was improper. Colley, 177 Wn. App. at 729. We affirmed the trial court's

admission of Dr. Pascualy's testimony. Colley, 177 Wn. App. at 729. We explained that the defense can rely on evidence in the record to show that the plaintiff lacked proof of causation when there are other known potential causes of plaintiff's injury. Colley, 177 Wn. App. at 729. In short, in Colley, we held that the defense may attack the premise of the plaintiff's causation theory, if the defense presents evidence of causation that is relevant and probative. Specifically, the evidence must first be admissible, and expert testimony must be based on facts in the record, or risk being overly speculative and inadmissible.

Colley is distinguishable because the experts in Colley relied on confirmed diagnoses, an extensive past medical history, and an admitted *history* of alcoholism. Here, Dr. Dreyer's experts relied solely on Needham's statement that he drank on the day of his collapse. The evidence does not show that Needham was inebriated when he collapsed or what his blood alcohol content (BAC) level was. Instead, the testimony was based on speculation, which was not supported by a factual basis in the record.

Indeed, Dr. Dreyer's experts agreed that the evidence was insufficient to make a determination as to whether alcohol use on the day of Needham's collapse was the cause thereof. Specifically, Dr. Starnes stated that "to a reasonable degree of medical certainty, [he] believe[d] that it's *possible* that Mr. Needham passed out due to chronic alcoholism and due to the benzodiazepines and opioids found in his bloodstream." Additionally, Dr. Starnes

testified that drinking alcohol can cause vasodilation[1] and "a cold environment mixed with alcohol . . . *would be* a very bad or potentially lethal combination." (Emphasis added.) It is true that on January 1, 2013, Needham admitted to his treating physician that he had been drinking prior to collapsing. But the record shows and Dr. Starnes admitted that "all [that] the facts show is that [Needham] was found" on January 1, 2013. Dr. Starnes concludes that in offering his testimony he was speculating as to the affect that alcohol could have had on Needham at the time of the collapse or whether it did. As Dr. Starnes indicated, the record does not contain facts showing that Needham passed out on December 31 from alcohol consumption or that alcohol consumption caused vasodilation. Likewise, Dr. Dreyer and the Clinic point to no support in the record for these necessary bases.

Another defense expert, Dr. Shalit, testified that benzodiazepines and narcotics were present in Needham's system when the hospital admitted him. However, he testified that alcohol "was not found to be present [in Needham] at the time of resuscitation but by history there was alcohol as well." Dr. Shalit went on to state that:

> [F]rom my point of view and in my experience, those would be more likely causes of passing out in a cold place than having pneumonia, but I can't say, because I wasn't there and because *we don't know enough details about the actual sequence of events in the hours before he was found.*

(Emphasis added.) In so testifying, Dr. Shalit admitted there was no evidence in the record as to either Needham's BAC level or whether Needham drank a

___

[1] Dr. Swenson testified that alcohol can cause blood vessels to dilate, or cause vasodilation, which increases heat loss.

sufficient amount of alcohol that night to cause his collapse. Yet, Dr. Shalit suggested that alcohol more likely caused Needham's collapse than pneumonia and a severe infection, the latter of which were proven to have existed when Needham was admitted to the hospital. Furthermore, Needham had no alcohol in his system when admitted into the hospital. Unlike the experts in Colley, Dr. Dreyer's experts did not rely on a known history of alcoholism and proven effects therefrom to present an alternative theory of causation. But rather, Dr. Dreyer's experts relied on speculation as to the as to the amount of alcohol consumed prior to the collapse[2] and speculation as to the potential effect of alcohol on Needham's collapse based on a statement that he had been drinking with no record or evidence of his blood alcohol level at the time of his collapse. Therefore, the trial court erred by admitting those opinions.

The trial court also erred because although the testimony on alcohol could be relevant, its probative value was substantially outweighed by the risk of unfair prejudice. Kramer is instructive in this regard. There, we concluded that the trial court abused its discretion when it admitted plaintiff's prior history of alcoholism and marijuana use because there was no easily discernible probative value for that highly prejudicial evidence. Kramer, 62 Wn. App. at 559. We had two concerns. First, the trial court prematurely ruled in limine, when the defense "had not made an offer of proof establishing the [evidence's] probative value." Kramer, 62 Wn. App. at 559. Second, we concluded that "absent evidence of

---

[2] Dr. Dreyer's counsel implied that Needham was "binge-drinking for seven days" prior to his collapse.

long-term, irreversible, adverse effects from marijuana smoking, it is difficult to discern the probative value of Kramer's preaccident marijuana smoking practices . . . [and] nothing in the record indicates [his] drug and alcohol use prior to the . . . accident affected his employment." Kramer, 62 Wn. App. at 559.

Here, the ruling was not premature. But, like in Kramer, the record does not indicate the extent of Needham's alcohol use on the day of or prior to his collapse, or whether it affected or caused his collapse the night of December 31. Thus, the evidence's probative value is difficult—if not impossible—to discern. On the other hand, the evidence likely had a significant prejudicial effect, which cast Needham as a heavy drinker, referenced alcohol within Needham's medical records, and provided the jury with a more understandable or relatable cause of collapse, i.e. over-consumption of alcohol. Because of the highly prejudicial nature of the evidence and the inability to discern its probative value, we conclude that the trial court abused its discretion by admitting it.

*Harmless Error*

Needham contends that reversal is required because the trial court's errors were not harmless. We agree.

To determine whether an error is harmless, the test is whether "the outcome of the trial would have been materially affected." Demery, 144 Wn.2d at 766. With regard to the impropriety of the exercise of judgment instruction: "an erroneous jury instruction is harmless if it is not prejudicial to the substantial rights of the part[ies] . . . , and in no way affected the final outcome of the case." Blaney v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. No. 160, 151

20

Wn.2d 203, 211, 87 P.3d 757 (2004) (alterations in original) (internal quotation marks and citation omitted).

Here, the trial court's errors were not harmless for several reasons. First, Needham's alcohol use on the day of his collapse was discussed throughout the trial. Dr. Starnes testified that "chronic alcoholism" affected Needham, but the record does not support this testimony, and it is highly prejudicial. Additionally, during the re-direct examination of Dr. Dreyer's expert, Dr. Curtis Veal, Jr., Dr. Dreyer's counsel posed a hypothetical in which he asked the expert about the physical effects of "binge-drinking for seven days from Christmas Eve to New Year's Eve." This hypothetical was unsupported by the record and clearly prejudicial. Furthermore, to rebut the highly prejudicial testimony regarding alcohol, Needham had to address the concern about alcohol during *voir dire* and trial, including with the testimony of a toxicologist. In short, the record is replete with prejudicial discussion of Needham's alcohol use the day of his collapse.

Second, Dr. Dreyer and the Clinic assert that, because the jury did not reach the issues of causation or damages, any prejudicial effect of discussion of how Needham's alcohol use could have caused his collapse is inconsequential. However, the nature of alcohol-related testimony is highly prejudicial to the case as a whole. Alcohol and drug use could result in a jury thinking poorly of a party and ruling against that party. See Kramer, 62 Wn. App. at 560. Here, as in Kramer, we are particularly concerned that the jury may have rejected Needham's claims because they thought poorly of him. Kramer, 62 Wn. App. at 559-60. In Kramer, we held that the fact that the defense did not allege that

21

Kramer was intoxicated at the time of the accident weighed in favor of a harmless error finding. 62 Wn. App. at 560. Here, in contrast, the testimony from Dr. Dreyer's experts suggested that Needham was intoxicated at the time of his collapse. Thus, the trial's outcome was materially affected.

Finally, we cannot ignore that giving the exercise of judgment instruction nearly always results in a defense verdict, and courts should use the instruction with caution. See Fergen, 182 Wn.2d at 818 (Stephens, J., dissenting). Indeed, the four Justice dissent in Fergen noted that "[i]n every case to have considered an error of judgment instruction, this court has recognized this type of instruction serves to emphasize the defendant's theory of the case." Fergen, 182 Wn.2d at 818. Here, the jury instruction affected the final outcome of the case when it emphasized Dr. Dreyer's theory that Needham's drinking alcohol on December 31 caused his collapse. Given that the testimony was prejudicial to Needham's clams, it cannot be said that his substantial rights were unaffected. Thus, where, as here, the instruction was improper, the error can hardly be said to be harmless.

Dr. Dreyer and the Clinic make three assertions in support of their contention that the error was harmless. First, they contend that we should not consider the testimony's prejudicial effect on appeal because Needham has not provided transcripts of the opening or closing arguments, which are necessary to present an adequate record. They are necessary, respondents argue, because Needham claims that respondents emphasized—including with the use of visual aids—Needham's alcohol consumption during opening and closing. But even

22

though we did not have and did not rely on statements made during opening or closing arguments, the record on appeal is adequate to conclude that the evidence was highly prejudicial and not harmless. Cf. Story v. Shelter Bay Co., 52 Wn. App. 334, 345, 760 P.2d 368 (1988) (withholding review of defamation allegations pertaining to a series of letters when only two of the many letters were included in the record on appeal). Specifically, both experts discussed Needham's alcohol use at length, and Needham was required to present expert testimony from a toxicologist in an attempt to preempt the power of the defense's arguments.

Second, Dr. Dreyer contends that Needham did not identify supporting evidence for his claim that the respondents "cast [him] in a pejorative light" and tainted the jury against him. But Needham discussed the prejudice from Dr. Dreyer's experts at length. Therefore, Dr. Dreyer's argument is unpersuasive.

Finally, Dr. Dreyer contends that the record does not show that "any party urged the jury to consider Mr. Needham's alcohol use in evaluating whether [the doctors] violated the standard of care." To the contrary, claims Dr. Dreyer, the jury verdict came down to whether the jury believed:

> [(1)] that Dr. Dreyer failed to fully investigate and rule out a serious pneumonia infection . . . or [(2)] that Mr. Needham did not have pneumonia on December 28. [And therefore,] Dr. Dreyer reasonably evaluated his clinical presentation and provided recommendations and referrals necessary to complete a diagnosis explaining his chief complaint of diarrhea . . . and although the cause of his collapse cannot be known, *the facts do not allow the impact of his alcohol consumption to be ruled out.*

(Emphasis added.) Dr. Dreyer fails to recognize that even in her description, the jury necessarily considered alcohol consumption while making its determination of whether the standard of care was violated. Thus, Dr. Dreyer's contention fails.

For these reasons, we reverse the jury verdict and remand for a new trial.

WE CONCUR: